Vescio *v.* Pennsylvania Electric Company,
Appellant.

Argued September 29, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

*George Y. Meyer,* with him *Samuel G. Wagner, Harold S. Hampson* and *Philip G. Damiani,* for appellant.

*Edward E. Petrillo,* with him *A. C. Flick, Jr.,* of *Stone & Flick,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 27, 1939:
Plaintiff brought an action in trespass against defendant for the death of her son, Michael Vescio.

Defendant produces and distributes electric current for light and power, and as part of its business maintains and operates a transforming sub-station at Warren, Pa. The entire premises of this sub-station are enclosed by a high wire fence, and entrance to the premises is only through a small building. Within the enclosure there are transformers and wires, with structures supporting them.

On the morning of November 8, 1936, P. J. Crowley, defendant's employee, was in charge of this sub-station. While two other employees of defendant, Smith and Schaffer, were engaged in making repairs to the steel structure and were mounted thereon, Smith in some manner came in contact with a "live" wire, which burned him, rendered him incapable of helping himself, and as a result he was thrown across the girder and wiring, and his clothes ignited. Crowley shut off all the power and, with Schaffer's help, put out the fire. Crowley, realizing that he and Schaffer would not be able to get Smith down, looked out toward the public highway, saw Michael Vescio, plaintiff's decedent, age 21, and some others on the sidewalk outside the fence, and asked that some of them come into the station to help him. Vescio and a few others responded. Crowley procured a ladder and Vescio climbed it to get to the wires to help Smith. Crowley testified: "I got to the switchboard" and "shut off all the incoming power, to the best of my knowledge." Having done this, Crowley thought that all the lines were dead. After Vescio helped to tie a knot in a rope around Smith's body, preparatory to lowering the latter to the ground, he stepped back and encountered a "live" wire of high voltage, which resulted in his death.

As Vescio was unmarried, his mother instituted this action against defendant. The latter filed an affidavit of defense in the nature of a demurrer, setting up, inter alia, that defendant "at the time he received the injury which caused his death was acting in the course of his employment as a temporary emergency employee of the defendant, and, therefore, the only liability of the defendant would be under the Workmen's Compensation laws" of this state. The demurrer was overruled. The jury rendered a verdict for plaintiff in the sum of $10,000. Defendant's motions for judgment n. o. v. and for a new trial were overruled and judgment was thereupon entered on the verdict. This appeal followed.

The first proposition of the appellant is that the deceased was an employee within the protection of the Workmen's Compensation Act, and that therefore an action for his wrongful death did not lie. The Workmen's Compensation Act of June 2, 1915, P. L. 736, excepts from its provisions those persons whose employment is "casual in character and not in the regular course of the business of the employer." In *Blake v. Wilson*, 268 Pa. 469, 112 A. 126, this court held that where a woman owning and operating a farm and engaged in no other business, employs a school teacher, during the temporary suspension of his school, to roof and paint a silo, the construction of which had been suspended for some time, and such employee is killed while at work on the silo, the accident is "casual in character and not in the regular course of the business of the employer," within the meaning of section 104 of the Workmen's Compensation Act of June 2, 1915, P. L. 736. In Justice STEWART'S opinion in that case he said: "The one rule which the court is allowed to apply in such case is limited to a consideration of the objects of the enactment, its purpose, and the appropriateness of the language used to the supposed purpose, in view of the legislature. . . . All will agree that its primary and general purpose was to substitute a method of accident insurance in place of common law rights and liabilities for substantially all employees, except such as are by express terms or necessary implication excluded from its operation." Justice STEWART held that the two conditions, i.e., the casual employment and employment not in the regular course of the employer's business, must concur to constitute the exception. He said that the character of employment in that case "may well be regarded as casual considering . . . that it was out of the line of his regular employment. . . . An employee's engagement is casual in character when it comes about by chance, fortuitously, and for no fixed duration of time." In considering the question, was the employ-

ment in the regular course of the employer's business, he said: "The regular course of the business can only refer to the experience and custom in the conduct of the business as is of usual, if not daily, occurrence and observation." He also said: "The word 'regular,' as it is used in the statute, does not qualify the word 'business' but the course of the conduct of that business." He cited the case of *Maryland Casualty Co. v. Pillsbury*, 172 Cal. 748. There a machinist was employed by a farmer, merely to repair a tractor, and it was held that the repairing of the tractor was not in the usual course of the occupation of the farmer.

In *Passarelli v. Monacelli*, 121 Pa. Superior Ct. 32, 183 A. 65, that court held that "workmen are engaged in casual employment when they are employed only occasionally, irregularly or incidentally as distinguished from those employed regularly and continuously. . . . The words 'regular course of business of the employer' have reference to the habitual or regular occupation that the party is engaged in with a view of winning a livelihood or some gain: *Blake v. Wilson*, 268 Pa. 469, 112 A. 126, and the most natural meaning is that they refer to the normal operations which regularly constitute the business in question, excluding incidental or occasional operations arising out of the transaction of that business, such as, now and again repairing the premises, appliances or machinery used therein." In *Sgattone v. Mulholland & Gotwals, Inc.*, 290 Pa. 341, 347, 138 A. 855, this court said: "When the employment is by chance, without fixed duration of time, it may be said to be casual, but, even if so, the master is responsible if the work was in the regular course of his business, by which is meant during the normal operations which constitute it [citing cases]." The question whether on the facts found an employment was casual in character or in the regular business of the employer within the meaning of the act, is one of law: *Callihan v. Montgomery*, 272 Pa.

56, 115 A. 889, and *Boyd v. Philmont Country Club,* 129 Pa. Superior Ct. 135.

In the case at bar the employment of the deceased was clearly casual in character, as that phrase has been interpreted by the appellate courts. It was also *not* in the regular course of the defendant's business but under an abnormal, unexpected and accidental circumstance, which cannot be properly regarded as being "in the regular course of the employer's business." Defendant's regular course of business is the generation, transmission and sale of electric current. It is not in the business of removing injured workmen from perilous situations and starting them on the way to medical or other necessary attentions. There is nothing in the Workmen's Compensation Act to bar this action of tort.

The next proposition of appellant is that the plaintiff failed to make out an actionable case. In *Janock v. B. & O. R. R. Co.,* 252 Pa. 199, 97 A. 205, this court said: "Granting the burden was on plaintiff to furnish evidence of negligence beyond the mere fact of the happening of the accident, it is not, however, necessary in all cases to prove negligence by positive evidence. There are many instances where the burden resting on plaintiff may be met by proof of circumstances from which the jury are permitted to infer negligence on the part of defendant." In *Maerkle v. Pittsburgh Rys. Co.,* 311 Pa. 517, 165 A. 503, we said: "In *Shafer v. Lacock Hawthorn & Co.,* 168 Pa. 497, 504, 32 A. 44, this court quoted approvingly from Sherman & Redfield on Negligence, sections 59 and 60, as follows: 'The accident, the injury and the circumstances under which they occurred are in some cases sufficient to raise a presumption of negligence and thus cast on the defendant the burden of establishing his freedom from fault. When the thing which causes the injury is shown to be under the management of the defendants and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords

reasonable evidence, in the absence of explanation by the defendants that the accident arose from a want of care.' " To the same effect is *Maltz v. Carter*, 311 Pa. 550, and *Gawronski v. McAdoo*, 266 Pa. 449. In *MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, 166 A. 589, we said: " 'A higher degree of care and vigilance is required in dealing with a dangerous agency [in that case electricity] than in the ordinary affairs of life or business, which involves little or no risk of injury to persons or property': 20 R.C.L. sec. 47, page 5."

While in the case at bar there is testimony that the current was "shut off," the fact remains that Michael Vescio, while on defendant's premises by invitation, received through his body an electric current of sufficient voltage to cause his death. If the current had been completely "shut off," as under the circumstances it should have been, this accident would not have occurred. If the switches which Crowley testified he opened at the time in question were in fact open and if the switchboard itself was not defective, it is a legitimate inference that the wire which deceased came in contact with would not have carried a charge of electricity. Crowley's testimony as to shutting off the current by throwing the switch was corroborated by witness J. R. Campbell, who was the operating engineer at the plant. He testified that Crowley "opened up all the switches on the different circuits." He was asked: "Did that cut off the electricity where this body [i.e., Smith's] was?" He answered: "It did." He said that Crowley "opened the controls of the switchboard, what we call cleaning house, every switch up through it." Arnold Scheaffer, another witness, testified that on the morning of the accident and before it took place, he was ordered to work on the switchboard, that he and Smith (who was fatally injured just before Vescio came in contact with the "live" wire) started to work about 8 a. m. He said that he "found some bushings which were dirty" and that he "went to clean those." He also said that he was work-

ing on a particular switch which "was out of adjustment and did not make proper contact." It was a little later after he and Smith had worked on these switches that Smith, who "had noticed some bolts out on the steel structure on the tubing that was isolated," "started to crawl" up about fourteen feet on the structure "to get over there to replace bolts." (It was there that Smith, according to this witness, "lost his balance" and "got too near the 'live' circuit," and was fatally burned.) From this testimony that there was something defective in the switchboard that morning, though Scheaffer testified that he and Smith "tightened up the switch and adjusted the contacts," and from all the other testimony in the case, and in the absence of exculpatory evidence, the happening of this fatal accident to Vescio presented a case for submission to the jury and supports a verdict in favor of the plaintiff.

Appellant bases an assignment of error upon the court's permitting Dr. Cashman, a witness called by the plaintiff, to repeat the conversation between himself and workman Smith, who, upon being taken to the hospital, made statements to the doctor that he thought the current had been shut off but that it was not shut off until after Vescio was electrocuted. At this time Smith was described as being in severe agony and pain, "morphine in large doses was given and he talked incessantly about his pain and about the fact that he thought the current was shut off." Appellant maintains that "this testimony was inadmissible because it was hearsay, and was definitely not res gestae because it lacked the spontaneity required to bring that within the exception to the hearsay rule, and would not be binding upon the defendant in any event." This testimony would not be inadmissible simply because it was made by some one *other than* Vescio. "That nervous excitement which renders an utterance admissible may exist equally for a mere bystander as well as for the

injured or injuring person, and therefore the utterances of either, concerning what they observed, are equally admissible": Wigmore on Evidence, 2nd ed., Vol. 3, sec. 1755. However, on account of the lapse of time between the accident to Smith and his statement about it, it is doubtful if his statement, even though apparently a spontaneous one, can be regarded as part of the res gestae. See *Com. v. Fugmann,* 330 Pa. 4, 17, 198 A. 99. It is not necessary to decide this, for assuming this testimony was improperly admitted, it was not prejudicial to the defendant since there was no substantial dispute about the fact that those involved in this accident thought the current was turned off or about the fact that the wire which Vescio came in contact with was a "live" one.

Appellant complains that the verdict of $10,000 is excessive. The testimony showed that on November 8, 1936, the date of Vescio's death, he was between 21 and 22 years of age and that he was unmarried. He supported his mother with weekly contributions ranging from $10 to $15, which included payments for his room and board on those occasions when he was at home. When he worked away from his mother's home, he made the same contributions to her. He also bought her considerable household equipment such as an electric iron and washer, and he provided her with coal. He also paid the interest on a mortgage of $1500 on his mother's property and occasionally paid something on the principal. He also paid the taxes. The mother received no support from her husband who had deserted her and "went back to the old country" ten years previously. The undertaker's expenses in this case were $543.50 and the burial expenses $56.70, making a total of $600.20. As to decedent's earnings, it was shown that when he worked for the General Electric Company in Erie, they ranged from $25.00 to $30.00 per week. It was testified that he was the only person contributing to his mother's

support and that he had promised her that he would never get married as long as she lived, so that he could take care of her. The mother at the time of her son's death was 58 years of age.

It was the duty of the jury to consider, in arriving at a verdict in this case, the age of the mother, how long she would be likely to live, and whether or not her son would continue to support her during her life's duration. It also had the right to consider the probability that he might marry and thereby diminish his ability to support his mother. In estimating what amount the mother would lose in future contributions from her son, it was the duty of the jury to reduce this to its "present worth," i.e., to a sum which if paid on the date of the verdict would then be a just cash equivalent of the sum total of such lost future contributions. See *Littman v. Bell Telephone Co.*, 315 Pa. 370, 377, 172 A. 687.

Under the evidence, our conclusion is, applying the tests laid down by law for measuring damages in cases of this character (see *Gaydos et al. v. Domabyl,* 301 Pa. 523, 152 A. 549), an award in excess of $6,600 cannot be sustained.

The judgment of the court below is reduced to $6,600 and, as modified, is affirmed.