## Murray, Admr., *v.* Philadelphia Transportation Company, Appellant.

Argued December 3, 1947; reargued January 14, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*H. Rook Goshorn* and *Philip Price,* with them *Bernard J. O'Connell,* for appellant.

*James F. Masterson,* with him *G. Fred DiBona,* for appellee.

Opinion by Mr. Justice Linn, March 26, 1948:

Defendant appeals from judgments for the death of James J. Murray, aged 2 years, 8 months and 20 days. The verdict was for the plaintiff in the sum of $1,000 on the count for the benefit of the parents under section 19 of the Act of April 15, 1851, P. L. 669, 12 PS 1601. The verdict was $14,000 on the count under the Act of July 2, 1937, P. L. 2755, 20 PS 772, authorizing suit by personal representatives in "all personal actions which the decedent whom they represent might have commenced and prosecuted . . ." Defendant's motions for a new trial and for judgments n.o.v. were overruled on condition that plaintiff file a remittitur reducing the $14,000 verdict to $10,500. The remittitur was filed and judgments were entered.

The infant, crossing 25th Street at or near Swain Street, in Philadelphia, was struck by defendant's northbound street car and, without regaining consciousness, died almost immediately. The evidence would have supported a finding that the infant darted into the path of the car in circumstances in which the motorman should not have been expected to see him in time to avoid injury. On the other hand, there was evidence from which the jury might have found that the motorman should have seen him in time to stop the car. In that state of the record, defendant's motion for judgment n.o.v. was properly refused: compare *Goldberg v. Phila. Rapid Transit Co.,* 299 Pa. 79, 149 A. 104; *Quattrocchi v. Pittsburgh Ry. Co.,* 309 Pa. 377, 164 A. 59.

The debatable point in the appeal is the measure of damages recoverable for the estate of the infant pursuant to the Act of 1937, supra. "It has been suggested that if a tort causes death, ordinarily two interests have been invaded. The first is the interest of the deceased in the security of his person and property, an interest which

has been invaded by compelling him to endure pain and suffering and to submit to the loss of earnings. There is no question that this interest should be protected; moreover it seems clear that the recovery should be an asset of the estate and as such subject to the claims of creditors.[1] The second interest is that of the deceased's relatives, an interest in the nature of an expectancy; their anticipation of sharing in his prospective earnings is necessarily destroyed by the termination of the victim's life. The problem of protecting these interests is two-fold: to exact compensation from the wrongdoer for the invasion of both interests, and to assure thereafter its distribution to those properly entitled." [2]

The origin of the common law rule denying a right to sue for wrongful death is described in *Admiralty Commissioners v. S/S Amerika,* 1917 A.C. 38, 50. The rule was superseded in this Commonwealth by three statutory provisions: one providing a right of action for wrongful death, and two providing for survival of rights that would otherwise have been lost under the common law rule. Section 19 of the Act of April 15, 1851, P. L. 669, 12 PS 1601, authorized suit, for the death, for the benefit of certain relatives. Section 18[3] of the Act of April 15, 1851, P. L. 669, provided for the survival of an existing action by substituting for the injured plaintiff who had brought suit and died before trial, his personal representative. The second survival provision is contained in the Act of 1937, supra, providing that if the injured person dies without bringing suit, his personal representative may sue for the benefit of his estate. The purpose of this legislation is to provide compensation, not punishment; there is no ground for holding that the legislature intended a duplication of damages. In order to avoid such duplication of damages,

---

[1] It was so held in *Taylor Estate,* 179 Pa. 254, 36 A. 230.

[2] 44 Harvard Law Review 980 (1931).

[3] This section was re-enacted by the Act of June 7, 1917, P. L. 447, section 35(a), 20 PS 771.

Pa. R. C. P. No. 2202 provides that both classes of claims shall be included in one action.

The first assignment of error complains of the following instruction to the jury: "After having determined what the life expectancy is, you would then come to a conclusion as to what the value of his economic life from age twenty-one would be, and that means his earnings without deduction during that period." Later, in the charge, the jury was instructed: "If you decide that the parents are entitled to a verdict and the administrator also is entitled to a verdict, you reduce the amount of what you consider the computation to be to its present worth." The instruction to "come to a conclusion as to what the value of his economic life from age twenty-one would be, and that means his earnings without deduction during that period" is challenged on the ground that the basis should have been net earnings and not gross earnings. In *Pezzulli v. D'Ambrosia*, 344 Pa. 643, 26 A. 2d 659, also a suit for an infant's death, the trial judge had charged that "the measure of recovery was the present worth of Charles' loss of earnings during his life expectancy, after deducting the cost of maintaining himself." In other words, his net earnings were considered the basic element. The court in banc granted a new trial on the ground that the restriction to net earnings was erroneous, that the proper measure of damages was "the present worth of his probable future accumulations during his life expectancy." [4] It will be observed that the jury had been instructed to find what the probable earnings of the child would have been (we assume after 21) and, after deducting the cost of maintaining himself, to allow the difference reduced to its present worth. We reversed the order granting a new trial and directed judgment for the plaintiff on the verdict which had been reached by allowing the present worth of decedent's net earnings.

---

[4] For present purposes it is unnecessary to consider what was intended by "future accumulations."

The instruction given to the jury in the *Pezulli* case, supra, required the application of a different measure of damages from the instruction given to the jury by the learned trial judge in this case. It is true that in the course of our opinion in the *Pezzulli* case it was said that in a suit by an injured person, continued after his death by his personal representative, the plaintiff may recover the same damages as his intestate would have received if he had survived. We said, "The elements of permissible recovery in such a case are well established —pain and suffering until the time of death, and the economic value of the life as measured by the present worth of likely earnings during the period of life expectancy, the diminution in earning power being total because of the death." But it is important to remember that that instruction was not given to the jury in that case and that the verdict was based on net earnings and not "likely earnings during the period of life expectancy."

In the trial of an action by an injured person, the jury is instructed to find (inter alia) the loss of earning power if a claim on that account is made. The jury sees the plaintiff and knows and considers that he must maintain himself during the period of his life expectancy and, in fixing the amount of recovery, has or should have that fact in mind. The cost of maintaining himself comes out of his pocket; it is immaterial whether it is paid out of savings or is ultimately taken out of his verdict (which represents his earnings) because in either case he pays for his own maintenance; all that remains is his net earnings. But if such a plaintiff dies, and his action is brought to trial by his administrator, he does not maintain himself during the period of his life expectancy; his administrator should therefore not receive anything for his maintenance during that period; he should receive only the loss of earning power less cost of maintenance, the remainder to be reduced to present worth. So, too, when the suit is for the benefit of the estate of the

person under the Act of 1937, the personal representative should not be permitted to recover all that the deceased might have earned had he lived. He does not maintain himself. If he had lived, his earnings would have been diminished by his living expenses during the period of the expectancy. Certainly it would be giving more than compensation if his administrator now recovered a verdict which included living expenses never incurred and which could never have been properly enjoyed by him.[5] This principle is recognized and applied in suits under the "death" statute allowing recovery by relatives where no suit has been brought in the lifetime of the injured person: *Gaydos v. Domabyl,* 301 Pa. 523, 530, 152 A. 549; *Vescio v. Pennsylvania Electric Co.,* 336 Pa. 502, 9 A. 2d 546; *Siidekum, Admr. v. Animal Rescue League,* 353 Pa. 408, 45 A. 2d 59.

In cases under the Survival Act of 1937, supra, the jury should be directed to ascertain what the earnings of the deceased person would have been during the period of his life expectancy [6] and to deduct from them the probable cost of his maintenance as shown by the evidence and to reduce the amount to its present worth.[7]

This rule, making net earnings a basic element in suits for loss to the estate, is applied in many jurisdictions. In *Pitman v. Merriman,* 80 N. H. 295, 117 A. 18 (1922) the statute provided that "when the death of the person is caused by wrongful act . . . which, had death not ensued, would entitle the person injured to recover

---

[5] In the Restatement, Torts, in the discussion following section 925, it is said: "In other States the damages are based upon the total probable earnings of the deceased reduced to present value. This is the same measure of damages as that which could have been recovered by him had he been permanently disabled but not killed and is more than compensatory since, had he remained alive, he would have had to provide for his own living expenses."

[6] Allowing for the fact that earning power, towards the end of the average life, becomes less and less: *McCaffrey v. Schwartz,* 285 Pa. 561, 571, 132 A. 810.

[7] At simple interest at the legal rate: *Windle v. Davis,* 275 Pa. 23, 29, 118 A. 503.

damages therefor, then on the death of such person his executor . . . may . . . recover damages for the injury to the person and the estate of such person caused by such wrongful act or neglect and consequent death . . ." The charge to the jury was interpreted as an instruction to deduct from the earning capacity "what it would cost him to live." See also *Morrell v. Gobeil,* 84 N. H. 150, 147 A. 413, 414. *McAdory v. Louisville & Nashville Ry. Co.,* 94 Ala. 272, 10 So. 507, was an action by a personal representative for the death of a 20 year old boy; the verdict of $9,395 was held excessive. It was said the jury should have been instructed to find a "sum which with legal interest during the period of the expectancy of life added would produce at its expiration a sum equal to the amount of the net earnings during the same period." *Russell v. Windsor Steamboat Co.,* 126 N. C. 961, 36 S.E. 191, was an action by the administrator of a child aged 5 months. A verdict of $1,000 was sustained. The charge was that "the measure of damages was the present value of the net pecuniary worth of the deceased to be acertained by deducting the cost of his own living and expenditures from the gross income based upon his life expectancy." See also *Rea v. Simowitz,* 226 N. C. 379, 38 S.E. 2d 194. *Chesapeake & Ohio Ry. v. Lang's Administrator,* 100 Ky. 221, 38 S.W. 503, was an action by a personal representative for the death of an 18 year old boy; the net earnings rule was applied, the Court saying the jury should "in estimating the loss to the estate, take into consideration what would have been the necessary and economical living expenses of the deceased had he not been killed." *Florida East Coast Ry. Co. v. Hayes,* 67 Fla. 101, 64 So. 504 (1914) was an action by the administrator of a child. The Court said: "In effect, the court instructed the jury if they find for the plaintiff to award such sum as the evidence shows the decedent would probably have accumulated during his life expectancy from his probable earnings after he would have reached the age of 21 years, reduced to a money value,

and its present worth to be given as damages." In this case the minor was 13 years and 5 months old. The verdict was $15,000. The court applied present worth and life expectancy tables to the verdict to show that it was excessive and reduced the verdict to $2,000. See also *Tully v. P. W. & B. R. R. Co.*, 3 Pen 455 (Del.) 50 Atl. 95; *Florida etc. R. R. Co. v. Sullivan*, 120 Fed. 799 (U.S.C.A. 5th Ct.); *Carlson v. Oregon Short Line R. R. Co.*, 21 Ore. 450, 28 Pac. 497; *Louisville etc. R. R. v. Garnett*, 129 Miss. 795, 93 So. 241.

The subject is considered in volume 4 of the Restatement, Torts, section 925, pages 638 to 642; in McCormick: Damages (1935) section 96,[8] and in 16 American Jurisprudence, sections 194 and 195, page 131.

For the reasons stated we must sustain the assignment of error complaining of the use of gross earnings instead of net earnings as a basic element in reaching the verdict.

Both judgments are reversed and a new trial is awarded.

---

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

I dissent from the decision in this case for the following reasons:

1. The majority opinion characterizes the dicussion in *Pezzulli, Administrator, v. D'Ambrosia*, 344 Pa. 643, 26 A. 2d 659, as "dictum". That case, being the first to reach this Court after the enactment of the new Survival

---

[8] At page 342 McCormick says: "A third view is that the present worth of the probable *gross earnings* which the deceased would have made should be taken as the basis of recovery, without deduction for any expenses whatever. Since the premature death has not only cut off the prospective earnings of the deceased, but has cut off his living expenses also, it is difficult to justify the award of gross earnings as a measure of the loss caused by the death, and consequently this view is not widely adopted."

Act of July 2, 1937, P. L. 2755, called for an interpretative study of that statute, particularly in regard to the proper measure of damages in suits thereunder and in order to avoid a possible duplication of damages with those recoverable under the Death Act of April 15, 1851, P. L. 669, section 19. I do not think that any opinion rendered by our Court ever received from it more careful and earnest consideration. It was unanimously agreed by us that the view taken by the court below en banc was wrong and that the instruction given to the jury by the trial judge was also wrong in that it was less favorable to the plaintiff than that to which he was entitled; we affirmed the judgment only for the reason that the plaintiff, although vigorously contending that the charge to the jury was erroneous, was willing to accept the verdict that had been rendered in his favor; the opinion clearly indicated that he would have been awarded a new trial had he desired it.

2. If, under such circumstances, the rule there enunciated is technically to be regarded as dictum, the fact nevertheless remains that in the six years since that case was decided, not only has it been cited many times in our own reports and those of the federal courts, but we have sustained verdicts and judgments entered thereon in a number of subsequent cases in which the trial judge had followed the rule in regard to the measure of damages laid down in the *Pezzulli* case and in which alleged excessiveness of the verdict was directly in issue. Even if, therefore, it be true that the rule adopted in the *Pezzulli* case was dictum, later cases have converted it into a firmly established principle, and undoubtedly scores, if not hundreds, of cases have been tried in the lower courts in accordance with it.

3. Of much greater importance, however, as far as the doctrine of stare decisis is concerned, is the fact that by the present decision we are overruling not only the rule of the *Pezzulli* case and the cases which have followed it, but law which has been in force in Pennsyl-

vania for the past 97 years. The Survival Act of 1937 provides that "Executors or administrators shall have power . . . to commence and prosecute . . . all personal actions *which the decedent whom they represent might have commenced and prosecuted . . . . . .*" It is thus crystal clear—and it was so held not only in the *Pezzulli* case but also in *Stegner, Administrator, v. Fenton,* 351 Pa. 292, 40 A. 2d 473 (see also *Piacquadio, Trustee, v. Beaver Valley Service Co.,* 355 Pa. 183, 185, 49 A. 2d 406, 407)—that the action thus authorized is the *same* as that which the deceased might have commenced in his lifetime and his executor or administrator have continued after his death by authority of the survival section (section 18) of the Act of 1851. It is therefore governed, of course, by the same measure of damages;[1] indeed this is not challenged in the majority opinion. What the present decision must do, therefore, in order to justify itself, is to reverse the rule as to the measure of damages in cases under section 18 of the Act of 1851, for that is the rule that was followed in the *Pezzulli* case. Apparently recognizing this, the majority opinion, while it avoids referring to any of the long line of cases which it is in fact overruling, simply states that "In the trial of an action by an injured person, the jury is instructed to find . . . the loss of earning power . . . . But if such a plaintiff dies, and his action is brought to trial by his administrator . . . his administrator should . . . not receive anything for his maintenance during

---

[1] It was said in the *Pezzulli* case, p. 648, A. pp. 661, 662: "During the interval, however short, which elapses between the occurrence of the accident and the death of the injured person . . . there accrues to him a cause of action, because of the injury inflicted upon him, which entitles him to recover, if he has time in which to bring the suit, the present worth of his loss of earning capacity during his life expectancy. It is this cause of action which passes by the act of 1937 to his personal representative. Why, therefore, should there be any different measure of damages if, because of the severity of his injury and the consequent onrush of death, a writ is issued, let us say, a moment after, instead of a moment before, his death occurs?"

that period [of his life expectancy]; he should receive only the loss of earning power less cost of maintenance . . . ." The trouble with that declaration, however, is that it does not represent, and never has represented, the law of Pennsylvania; on the contrary, from the very first case decided under section 18 of the Act of 1851 down to the latest, every decision of this court has held that, where the victim of an accident brings a suit but dies before trial and his executor or administrator continues the action, the measure of damages is the same as that to which the deceased would have been entitled had he survived, namely, the economic value of his life as measured by the present worth [2] of his likely earnings during the period of his life expectancy: *Pennsylvania R. R. Co. v. McCloskey's Administrator*, 23 Pa. 526; *Maher, Administrator, v. Philadelphia Traction Co.*, 181 Pa. 391, 397, 398, 37 A. 571, 572; *McCafferty, Administrator, v. Pennsylvania R. R. Co.*, 193 Pa. 339, 346, 44 A. 435, 436; *Kaczorowski v. Kalkosinski, Administrator*, 321 Pa. 438, 441, 184 A. 663, 664; *Liguori, Administrator, v. Philadelphia*, 351 Pa. 494, 502, 503, 41 A. 2d 563, 566, 567; *McCullough, Administrator, v. Phil-*

---

[2] Incidentally, the majority opinion states that in reducing the amount recoverable to its present worth the reduction should be on the basis of the legal rate of interest, citing in support of this pronouncement *Windle v. Davis*, 275 Pa. 23, 29, 118 A. 503, 505. That case cites as its authority 17 C. J. 906, which in turn refers solely to the case of *Central of Georgia Rwy. Co. v. Mosely*, 112 Ga. 914, 38 S.E. 350. I cannot see any logical connection whatever between the maximum rate of interest which the law allows a creditor to charge and the amount of return which an investor can obtain on reasonably safe securities. The effect of the rule now being laid down is not only unrealistic (for everyone knows that any proceeds that may be recovered in this case cannot be safely invested on the basis of a 6% return) but it sharply diminishes the amount recoverable no matter which rule as to the measure of damages be adopted. It seems to me obvious that the discount computation should be made in accordance with the actual earning power of money, namely, the current rate of return on sound investment; see Restatement, Torts, §924, comment d.

*adelphia, Newtown & New York R. R. Co.*, 81 Pa. Superior Ct. 318; see also *Kriesak v. Crowe*, 36 Fed. Supp. 127, 129; also comment in 7 A.L.R. 1358, 1359; also 43 Dickinson Law Review, 107, 108; cf. *Paul v. Atlantic Refining Co.*, 304 Pa. 360, 156 A. 94. I venture to state (certainly it is true to the best of my knowledge and belief) that no judge in Pennsylvania has ever charged a jury in a case under section 18 of the Act of 1851 that in estimating the damages there should be a deduction equal to the probable expenses of the deceased plaintiff had his life not been destroyed by the accident. The present decision, therefore, not only overrules the *Pezzulli* and subsequent cases under the Survival Act of 1937, but also all the cases under the survival section (section 18) of the Act of 1851, the measure of damages under both statutes being admittedly identical. If, in order to avoid such a drastic overturning of a century's decisions, an attempt were now made to establish, in the teeth of the plain wording of the Act of 1937, a smaller measure of recovery under that Act than under section 18 of the Act of 1851, such an escape would be merely from Scylla to Charybdis, for the wholly deplorable consequence would be to restore the practice which prevailed before the Act of 1937 of an unseemly race to the prothonotary's office to have a writ issued before the victim of the accident passed away so as to reap the fruit of a larger measure of damages.

4. In the legal field of statutory construction it has frequently been asserted that if, after judicial interpretation has been given to a statute, the legislature does not amend the act, it must be assumed that the construction placed upon it by the court correctly represented the legislative understanding of the intended meaning of the statute and its desired effect. There have been three sessions of the legislature since the opinion in the *Pezzulli* case was handed down and no amendment has been enacted, so that the rule there established presum-

ably construed the Act of 1937 in accordance with the intent of the legislature.

5. The majority opinion cites cases from other jurisdictions apparently supporting the rule in regard to the measure of damages which the present decision seeks to introduce under our own Act of 1937. Those cases, however, are of no persuasive value whatever, and the same observation would be equally true of cases that might readily be cited from other jurisdictions which follow the *Pezzulli* rule. The reason is that the wording of the death and survival statutes varies greatly in the different jurisdictions and each decision concerning them must be weighed in connection with the phraseology of the statute which it interprets; some States have only a death statute and not a survival statute at all and others construe their survival statutes, by reason of their particular phrasing, as performing the function of death statutes by providing for damages to the relatives of the deceased; in such cases, of course, it is the net earnings of the deceased which alone could be enjoyed by the family. It is properly pointed out in appellee's brief that this applies especially to the Rhode Island, North Carolina and New Hampshire cases cited in the majority opinion. But our Pennsylvania Survival Act of 1937 is so clear in stating that an action instituted under it is the same action which the deceased might have commenced and prosecuted in his lifetime that there is no room left for the adoption of any rule of damages other than the one which, as already pointed out, has existed in Pennsylvania for close on to one hundred years.

6. The fact that the legislature enacted the Survival Statute of 1937 shows clearly that it did not consider that the Death Act of 1851 (section 19) furnished an adequate remedy in cases where a person was killed by the wilful act of negligence of a tortfeasor since it covered only that part of his earnings which he had been applying to the support of his family and did not provide for the loss which he himself suffered, namely, the

part of his earnings which he would have been able to spend for his *own* benefit had his life not been tortiously destroyed. But under the present decision the Survival Act will, in an overwhelming majority of cases, not allow of any such additional recovery at all, since it is only a small number of persons who can accumulate estates or, in other words, who enjoy an income in excess of their living expenses. It is not strange, for example, that in the case in the Federal court (before the decision in the *Pezzulli* case) in which an obviously intelligent and conscientious jury were instructed to return a verdict measured by the *net* earnings of the victim, they found against the defendant *but awarded no damages to the plaintiff under that test*; (*Voelkel v. Bennett*, 115 F. 2d 102). The present decision, to my mind, defeats the very purpose of the Act of 1937.

7. The rule laid down in the Pezzulli case has not worked unfairly or unsatisfactorily. Although in the six years since the rule was adopted a multitude of cases must have been tried in Pennsylvania involving its application this Court has had occasion in only a single instance to reduce a verdict rendered in accordance with it; (*Vincent, Administrator, v. Philadelphia*, 348 Pa. 290, 35 A. 2d 65). And even if occasionally such a verdict were excessive, as happens now and then in all kinds of negligence cases, the court always has control over it and could reduce it to a proper amount.[3]

8. I believe it is wholly impractical, not to say impossible, for a jury to determine the likely living expenses of a person killed in an accident if the victim happens to be a child or a young man or woman, it being obvious that such expenses would necessarily depend on his habits and tastes as he advanced to maturer age, on the scale of living which he might adopt, on whether or not he would marry and have children, on whether

---

[3] In conformity with the action taken by the court in the *Vincent* case the verdict under the Act of 1937 in the present case might properly be reduced to $7000.

he would have other family obligations, etc. Thus there is now being introduced into the law a factor the application of which must necessarily be unscientific and arbitrary and which will serve only further to confuse the determination of verdicts in such cases.

9. I think that a rule of law is immoral and therefore indefensible which makes it more financially advantageous for a tortfeasor to kill than merely to injure an innocent victim. Under the rule established by the present decision, killing an ordinary wage-earner, especially if unmarried, would probably cost the tortfeasor an extremely small sum if anything, whereas only injuring such a person would result in a larger award of damages since in that event his living expenses would not, of course, be deductible from the amount of his recovery. Surely such a state of the law would justly merit the reproach that it makes the destruction of human life less costly to the wrongdoer than would have been the case if the victim of the accident had merely been maimed.

10. It seems to me that the present decision results from a confusion between a rule which is appropriate when damages are claimed for the death of *another* person and when they are claimed for one's *own* death. In the former event, as where parents claim for the death of a child, or a wife for the death of her husband, the rule, of course, should be, and is, that recovery can be had only out of net earnings; the question there is: what is the economic value of the life of the deceased *to the claimant?* But under the Survival Act of 1937 the recovery is not for the benefit of the deceased's relatives; since it is the same action which he himself could have brought in his lifetime the recovery is for the damages which he personally has sustained by being deprived of his life; the question then is: what is the economic value of the life of the deceased *to himself?* And while it is true that, if he had lived, he would have been obliged to use his earnings for eating, sleeping under shelter,

recreation and amusements, such outlays, though in one sense expenses, constitute in and of themselves the very functions of life itself,—the sole purpose, indeed, for which earnings are sought as the recompense of labor. If the argument be valid that living expenses should be deducted because the deceased *in fact* escapes the necessity of paying them due to his enforced death, then logically no recovery at all ought to be allowed under the Survival Act of 1937 since the deceased would never *in fact* be able to utilize even the surplus, if any, of his earnings over his expenditures which the present decision would grant to him.

11. Finally, the present decision seems to me to be undesirable on the basis of social considerations, because it drastically diminishes the amount of the recovery which might inure to the benefit of the family of an ordinary breadwinner and thereby works a much greater hardship on them than the application of the rule would entail in the case of persons fortunate enough to have incomes greatly in excess of their costs of living.

Because, therefore, of what I regard as compelling reasons—practical, logical, moral and social—as well as because the present decision involves the overthrowing of a century of established law, I must respectfully dissent both from it and from the opinion written to support it.