## FAGAN v. UNITED STATES.
### Civ. No. 8115.

United States District Court
E. D. Pennsylvania.

Feb. 26, 1952.

Gerald A. Gleeson, U. S. Atty., Thomas J. Curtin, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

Freedman, Landy & Lorry, Philadelphia, Pa., for plaintiff.

CLARY, District Judge.

Sur Pleadings and Proof.

Upon the pleadings and proof I make the following findings of fact and conclusions of law.

Findings of Fact.

1. Plaintiff, Thomas R. Fagan, was duly appointed administrator of the Estate of Thomas Patrick Fagan, deceased, on March 14, 1947 on the Order of the Register of Wills of the County of Philadelphia, Commonwealth of Pennsylvania.

2. Plaintiff's decedent, Thomas Patrick Fagan, was a citizen of Philadelphia, Pennsylvania, and was employed as a taxi driver by Yellow Cab Company on March 6, 1947 and at the time of the incidents hereinafter related.

3. At all times relevant hereto, the Philadelphia Naval Base, Pier 5 at that Base and the U. S. S. "Macon" and U. S. S. "Galveston", and appurtenances, were owned, operated, controlled and possessed by the United States.

4. On March 6, 1947 at or about 7:00 p. m. the U. S. S. "Galveston" was moored at Pier 5, Philadelphia Navy Yard.

5. The means of access to the "Galveston" was a large raised wooden platform or brow which was about twelve feet square, extending inshore from the side of the ship, with stairs leading from the pier to the platform. The bottom of a gangway from the vessel rested on this platform at a point several feet away from the side of the platform nearest the vessel and the water edge of the pier. To board the vessel from the pier, a person first climbed the stairs to the platform, then proceeded several feet over the platform to the bottom of the gangway and then climbed the gangway to the vessel.

6. On March 6, 1947, plaintiff's decedent, while driving a taxi cab in the course of his employment, was requested to drive a passenger, Mason, to the Philadelphia Naval Base. He proceeded to the entrance of the Navy Yard and then drove his passenger to Pier 5.

7. The decedent was unable to locate the U. S. S. "Macon". He stopped the taxi at Pier 5 and walked toward the U. S. S. "Galveston" to obtain directions to the "Macon".

8. The defendant's watchman, Schwartz, was standing at the head of the gangplank of the "Galveston". The decedent ascended the steps to the platform but before he could ascend the gangplank was stopped by the shouting of watchman Schwartz who told him not to come up the gangplank. The decedent then walked along the platform parallel to the gangplank and asked Schwartz as to the location of the U. S. S. "Macon". Watchman Schwartz pointed to Pier 4, the adjoining space, and the decedent, confused by the beams of a light hereinafter described and the shouting and actions of the watchman, walked along the platform toward the side of the vessel until he fell off the unguarded edge of the platform to a floating camel between the ship and the dock.

9. While decedent had some impairment in his hearing, that impairment played no part in his fatal accident.

10. The platform from which the decedent fell did not have any guard rail or life line on the side next to the water and the side of the ship. The safety regulations of the United States Navy require that there be toe holds, hand rails and life lines on such a platform and these safety requirements are so recognized as a standard in the shipbuilding industry. Prior to the time of this accident a rail and/or a life line had been present, but they had been removed.

11. It was dark at the time of the accident and there were no lights on the platform itself. Light was furnished by a 300 watt cargo light and reflector at the head of the gangway on the ship, focused so that it shone directly into the decedent's face as he walked toward the open edge of the platform.

12. This cargo light was located approximately seven feet above the deck of the vessel. At the time of the accident, the level of the river was 5.8 feet below high tide.

13. When Fagan fell from the platform, his head struck the side of the ship and then he fell onto a "camel" between the ship and the dock. He later rolled into the water and drowned.

14. The decedent was moaning and groaning while lying on the camel, but the testimony does not support a finding that he was subjected to any pain and suffering.

15. This camel was a large timber floating on the water between the ship and the dock and acted as a buffer.

16. It was the custom and practice for taxicabs to proceed throughout the Navy Yard to pick up and discharge passengers. When the drivers could not locate the exact destination, they would make inquiry of passing personnel or at nearby buildings and ships. They were permitted to board the vessels for this purpose. These practices were known to the authorities at the Navy Yard and were not objected to by them.

17. The decedent was born on September 3, 1895 and was 51 years old at the

time of his death. His life expectancy was approximately 20 years.

18. Decedent was employed as a taxi driver by Yellow Cab Co. from February 1945 until the date of his death and was a steady, reliable worker. His average weekly wages during the year preceding his death was $54.50 per week. His average tips as a driver were $24.60. Decedent's average weekly earnings were $79.10.

19. Decedent had a savings account at the North Philadelphia Trust Company and during the year preceding his death (1946) he saved a total of approximately $600.

20. At the time of his death, decedent lived alone in a three-room housekeeping apartment with a kitchen. The rent for this apartment was $35 per month. He prepared his meals in his apartment. Decedent went to church regularly, was described as a "mild regular fellow", and approximately once a month attended a professional ball game.

21. Decedent was in normal good health at the time of his death, except that he had an impairment of hearing in the left ear which did not interfere with his occupation.

22. In 1943 the decedent was divorced. He left surviving him, as a dependent next-of-kin, his son, Thomas R. Fagan.

23. Decedent's son sustained a pecuniary loss of $720 per year as a result of his death. This pecuniary loss up to the time of trial was $2,520. In view of the better financial situation of the son at the time of trial, I find that the decedent's contribution to the son would reasonably have ceased by March 1, 1952. I find that the son suffered a pecuniary loss by reason of decedent's death in the amount of $3585.

24. Decedent had a reasonable working expectancy of 15 years, 5 years of which have expired. The present value of $1 invested at the rate of 4% for a period of 10 years is $8.2689.

25. I find that the economic value of decedent's life under the doctrine of Murray v. P. T. C., 359 Pa. 69, is $600.00 a year up to the present time or a total of $3,000. The economic loss to the Estate in the future will be $1050.00 a year based upon savings during the year 1946–1947 and the

saving of part of the amount he had previously given to the son. The total loss to date and the future loss reduced to present value is $11,682.35.

26. The funeral bill of $622 was fair and reasonable and was paid by the Administrator of the Estate.

### Conclusions of Law.

1. This Court has jurisdiction over the parties and over the subject matter of this suit.

2. Defendant was negligent and this negligence was the proximate cause of the decedent's death.

3. Plaintiff's decedent was not contributorily negligent.

4. Plaintiff is entitled to a judgment against the defendant as follows:

|   |   |   |
|---|---|--:|
| (a) | Pecuniary loss to son | $3,585.00 |
| (b) | Pecuniary loss to Estate | 11,682.35 |
| (c) | Funeral bill | 622.00 |
|   |   | $15,889.35 |