**Incollingo v. Ewing**

*James E. Beasley,* for plaintiffs.

*Mauro L. Ciccarelli,* for defendant Ewing.

*Edward W. Madeira, Francis E. Shields* and *Joseph R. Livesey,* respectively, for additional defendants, Parke-Davis, Cucinotta and Levin.

SPORKIN, WEINROTT and GRIFFITHS, JJ.,[*] October 9, 1969.—This matter was before the court en banc on motions of additional defendants for a new trial and judgment n.o.v.

This action in trespass was initially brought by Vincent Incollingo as guardian on behalf of his minor daughter, Mary Ann Incollingo (Mary Ann) and by Mary Ann's parents, Vincent Incollingo (Mr. Incollingo) and Connie Incollingo (Mrs. Incollingo) in their own right against Peirce G. Ewing (Ewing) to recover damages[1] for injuries allegedly suffered by Mary Ann as the result of ingestion of the drug Chloromy-

---

[*] Judge Edward J. Griffiths, the third member of the court en banc, is deceased.

[1] Suit was instituted February 6, 1962.

cetin.[2] The gravamen of their complaint was that Ewing, a pharmacist, was guilty of actionable negligence in providing Chloromycetin without prescription. The Chloromycetin was administered to Mary Ann and allegedly caused her injuries.

Thereafter, on April 6, 1962, Ewing joined as additional defendants, Domenic Cucinotta, M. D. (Cucinotta), Samuel Levin, D. O. (Levin), Parke-Davis and Co. (Parke-Davis) and Lederle Laboratories.[3] In this complaint against both Cucinotta and Levin, Ewing alleged that they had caused or contributed to Mary Ann's injuries by negligently prescribing Chloromycetin in disregard of its possible dangerous side effects. Ewing's joinder of Parke-Davis was based upon the allegation that it had failed to give adequate warning of the dangers inherent in the administration of Chloromycetin.

At the commencement of trial on October 30, 1967, plaintiffs informed the trial judge that Mary Ann was deceased[4] and their motion to amend the pleadings to include wrongful death and survival actions was granted.

The salient facts out of which the case arises may be recited as follows:

Mary Ann was born on December 29, 1955. On October 20, 1958, Cucinotta saw Mary Ann for what he recorded as "acute catarrhal rhinopharyngotonsillitis". He prescribed Chloromycetin, an anti-

---

[2] Chloromycetin is the generic term of the compound Chloramphenicol; for the purpose of simplicity it shall be referred to exclusively in this opinion as Chloromycetin.

[3] At the outset of trial, by agreement of all parties, a voluntary nonsuit was entered as to Lederle Laboratories.

[4] Mary Ann died on March 26, 1962. Her parents were duly appointed administrators of her estate and were substituted for her as plaintiff in this action.

biotic manufactured by Parke-Davis,[5] to be taken at the rate of one teaspoon four times daily.

Cucinotta next saw Mary Ann on July 9, 1959, because of a complaint of a cold and a running nose, and diagnosed "acute rhinopharingitis with complicating abdominal pain, possibly a mesenteric adenitis." He again treated her with Chloromycetin.

On January 22, 1960, Cucinotta saw Mary Ann for what her parents described as "the virus" accompanied by a slight cough and hoarseness. Cucinotta, at the time, entered into his records a diagnosis of "acute pharyngo-tonsillitis with complicating abdominal pain, probably mesenteric adenitis" for which he again prescribed Chloromycetin.[6] At no time up to and including the January 1960 visit were blood tests or bacteriologic cultures taken.

On February 7, 1960, Mrs. Incollingo felt that her daughter had a respiratory infection. She went to Ewing to seek a refill of the Chloromycetin prescription which had been given to her by Cucinotta on January 22nd. Ewing told her that a physician's authorization was needed for the renewal. Mrs. Incollingo called Levin, who, without seeing or examining Mary Ann, authorized the renewal of the prescription by telephone conversation with Ewing.

Mrs. Incollingo administered Chloromycetin as she felt the child needed it. She procured at least one additional telephone refill of the drug from Levin, of which at least part was administered in the same manner.

---

[5] Parke-Davis was the sole producer of Chloromycetin until 1967.

[6] He further testified that he had made the same diagnosis on October 20, 1958, and on July 9, 1959, and that his diagnosis of mesenteric adenitis on each of these three occasions was made on the basis of his palpation of small, olive-sized lymph nodes in Mary Ann's abdomen.

In May of 1960, Mary Ann was seen by Cucinotta with a history of bruising and nose bleeds. She was subsequently found to be suffering from aplastic anemia, the condition which eventually led to her death.

After trial, which lasted more than six weeks, the jury found in favor of plaintiffs and against all additional defendants and in favor of Ewing. The jury awarded damages in the sum of $215,000, which was comprised of $15,000 for Mrs. Incollingo and Mr. Incollingo in their own right and $200,000 for Mary Ann's estate.

The several additional defendants have based their motions on various alleged errors, and we shall now deal with these situations.

## PARKE-DAVIS

In support of its motion for a new trial, Parke-Davis contends, first, that the trial judge committed reversible error in permitting plaintiffs to proceed on the theory that Parke-Davis had caused the death of Mary Ann by inducing either Cucinotta or Levin, or both, to treat Mary Ann improperly with Chloromycetin. Parke-Davis argues that plaintiffs' complaint was founded solely on the alleged negligence of Ewing, in supplying Chloromycetin to the Incollingos without a prescription, and, therefore, plaintiffs should have been restricted in their case against Parke-Davis to proof of only those of its activities which might have brought about the alleged actions of Ewing.

This argument is clearly without merit. Pa. R.C.P. 2252(a) provides:

"In any action the defendant may . . . join as an additional defendant any person whether or not a party to the action who may be alone liable or liable over to him on the cause of action declared upon by the plaintiff or jointly or severally liable thereon with

him, . . ." Although the cases interpreting this rule have not been uniform, we believe that the better practice is that persuasively put forth by a leading commentator:

"The phrase 'alone liable . . . on the cause of action declared upon' should not be literally construed for no one but the original defendant can be liable upon the cause of action which the plaintiff declares against him. This is so because a cause of action is not a 'floating' right to recover but is a right held by a specific person against a specific person. When P brings suit against D1 and alleges that D1 caused him harm, P is declaring upon a cause of action against Dl. If Dl claims that D2 is the person who did the act which produced P's injury, he does not allege that D2 is liable upon the cause of action which P asserts against Dl. Rather he asserts that the cause of action which the law confers upon P to redress the injuries complained of is a cause of action against D2. D1 therefore does not allege that D2 is liable upon the 'P v. Dl' cause of action but alleges that there is no such cause of action and that the only cause of action which P owns is a 'P v. D2' cause of action. The words 'cause of action' in this provision of the rule should therefore be construed to mean 'damages or injuries', so that the defendant may allege that the additional defendant is 'alone liable (to recompense the plaintiff) for the damages or injuries declared upon.'

"Unless this construction of the rule is followed, D1 will be deprived of his right of joinder in every case where he seeks to join D2 upon the ground that D2 caused P's injuries by conduct differing from that alleged by P in his claim against D1. By way of illustration, assume that P hires D1 to erect steel framework for a building and hires D2 to do the stone and brick work. Shortly after completion the structure collapses. P sues D1 for improper performance of his

contract, alleging that D1 constructed the steel framework negligently. D1 wishes to deny any fault on his part and wishes to show that the cause of the collapse was the improper masonry work on the part of D2. D1, in ordinary language, wishes to say to P that he did not cause the plaintiff's trouble but that D2 did. Analytically, what D1 wants to say to P is that P has no cause of action against D1 to recover for the alleged injuries and that the only cause of action which P has to recover for those injuries is a different cause of action which lies against D2. Under these facts, D1 cannot with accuracy state that D2 is the person liable upon the cause of action declared upon by the plaintiff. D1, however, should be permitted to join D2 as an additional defendant in such a case. The ground of sole liability to the plaintiff upon the cause of action declared upon should be satisfied by any facts which indicate that the harm of which the plaintiff complains has been caused by the conduct of the additional defendant": 3 Goodrich-Amram, §2252(a) -6, P. 25-27.

This interpretation has been adopted by several of our courts in cases similar to the one before us: Hayden v. Groff, 22 D. & C. 2d 654 (1960); Thomas v. Allegheny, 114 Pitts. L. J. 25 (1965); Fuessner v. Nautilus Industries, 58 Luz. 281 (1968). In our opinion, to accept the narrow interpretation of the rule urged by Parke-Davis would be to effectively emasculate it.

Moreover, as Parke-Davis' objection to its joinder is founded in misjoinder of causes of action, it should have been raised by preliminary objection; Pa. R. C. P. 1017(b)(5). Since it was not so raised, it was effectively waived: Pa. R. C. P. 1032.

Parke-Davis next complains of the admission in evidence of testimony regarding the warning adopted by it in 1961 to replace the earlier cautionary language as to Chloromycetin's possible dangerous side

effects which had appeared in medical journals and literature.[7] It contends that since the Chloromycetin was prescribed for Mary Ann prior to 1961, evidence of the change in phraseology of the warning in 1961 was not relevant to the issue of the adequacy of the warning as it was worded at the time the drug was

---

[7] Prior to 1961, the warning issued by Parke-Davis was as follows:

(Label of packages) "Warning-Blood dyscrasias may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made."

The company literature and advertisements always contained a statement substantially as follows:

(Literature and advertisements) "Chloromycetin is a potent therapeutic agent and because certain blood dyscrasias have been associated with its administration, it should not be used indiscriminately or for minor infections. Furthermore, as with certain other drugs, adequate blood studies should be made when the patient requires prolonged or intermittent use."

In 1961, this was changed to:

(On container label) "WARNING: Blood dyscasias may be associated with the use of chloramphenicol. It is essential that adequate blood studies be made. (See enclosed warnings and precautions)".

(Enclosed Insert) "WARNING: Serious and even fatal blood dyscasias (aplastic anemia, hypoplastic anemia, thrombocytopenia, granulocytopenia) are known to occur after the administration of chloramphenicol. Blood dyscrasias have occurred after short-term and with prolonged therapy with this drug. Bearing in mind the possibility that such reactions may occur, chloramphenicol should be used only for serious infections caused by organisms which are susceptible to its antibacterial effects. Chloramphenicol should not be used when other less potentially dangerous agents will be effective or in treatment of trivial infections such as colds, influenza, viral infections of the throat, or as a prophylactic agent. Precautions: It is essential that adequate blood studies be made during the treatment with the drug. While blood studies may detect early peripheral blood changes, such as leukopenia or granulocytopenia, before they become irreversible, such studies cannot be relied upon to detect bone marrow depression prior to development of aplastic anemia."

prescribed for use by Mary Ann. With this we disagree. While it is well settled that proof of actions taken after the accident by defendant to correct the defect which caused plaintiff's injuries is not admissible to show antecedent negligence, evidence of such actions, under the proper circumstances, may come in to demonstrate one of the precautionary steps which could have been taken by defendant to avert the accident: Hyndman v. Pennsylvania Railroad Company, 396 Pa. 190 (1959).

Parke-Davis argues, however, that the rule laid down in Hyndman, supra, regarding subsequent actions applies only to cases involving section 339 of the Restatement of Torts.

We are not persuaded by this argument. In our view to accept the thesis urged upon us by Parke-Davis would give to the Hyndman case a very parochial interpretation completely at variance with the liberal trend in modern evidence rules. Indeed, the reasons for admission in evidence of the later warning of Parke-Davis in the instant case are even more compelling than those which were present in Hyndman. Here, the jury was required to appraise the adequacy of a warning which was couched in highly technical terms. The 1961 warning offered a necessary basis of comparison by which the jury could better gauge the effectiveness of the earlier warning in alerting physicians to the dangers of the drug. If the Hyndman case did not completely open the door to all evidence of warnings adopted subsequent to the accident, it certainly left it ajar sufficiently to permit admission of such evidence where dictated by circumstances and accompanied by the appropriate safeguards. In our opinion, the circumstances here clearly called for

admission of the 1961 warning and the instructions of the trial judge afforded the requisite safeguards.[8]

Parke-Davis also contends that the trial judge erred in admitting in evidence the testimony of Dr. Edward H. Magee regarding his personal experience with the efforts of Parke-Davis' detail men to encourage the use of Chloromycetin in treating patients. We feel the admission of this testimony was entirely proper. To fully understand our reasons for upholding its probity and competence, however, it might be well to review in some detail the requisite elements of plaintiffs' case against Parke-Davis. For the jury to render a verdict against Parke-Davis, it was necessary that it find that (a) Parke-Davis knew or had reason to know that influence brought to bear upon physicians regarding the use of Chloromycetin would be effective; (b) Parke-Davis actually exerted such influence upon Cucinotta and/or Levin, and (c) such influence caused either or both of them to improperly prescribe Chloromycetin for Mary Ann. In our view, Dr. Magee's testimony detailing the custom among physicians in the Philadelphia area of relying upon detail men for information about new drugs, including Chloromyce-

---

[8] "Members of the Jury, I admitted into evidence the 1961 warning placed by Parke-Davis on its Chloromycetin packages. The law of this Commonwealth is clear that evidence of subsequent precautions is not admissible for the purpose of proving antecedent negligence. I therefore want you to carefully understand that the admission into evidence of the 1961 warning, which was one year prior (sic) to the administration of the drug in this case, *is not to be taken by you as evidence bearing on antecedent negligence, but was admitted for the limited purpose to show a caution which was not costly or burdensome to Parke-Davis in relation to the risk or danger involved. I repeat, you are not to construe this as evidence of prior negligence.*" (Italics supplied.)

tin, was clearly relevant, directly as to (a), indirectly as to (b) and corroboratively as to (c).

With respect to (a), it is clear that Dr. Magee's testimony supported the inference that Parke-Davis was fully aware of the dependency which doctors had developed upon detail men for information. Insofar as (b) is concerned, Levin's admission that he prescribed Chloromycetin for Mary Ann as a result of representations by Parke-Davis' detail men, by itself, would have been insufficient to attach liability upon Parke-Davis. To close the circle of proof against the drug company, it was necessary, in addition, to show that those representations were within the scope of the authority of the detail men. Plaintiffs chose to prove this circumstantially, through Dr. Magee, by showing a plan or scheme for promoting the use of Chloromycetin, of which the influence exerted upon Levin was a part. While no Pennsylvania court, to our knowledge, has had before it the question of the admissibility of such evidence, it is the rule in other jurisdictions that such a plan or scheme may be proven by evidence of other similar acts: Altman v. Ozdoba, 237 N. Y. 218, 142 N.E. 591; Citizens Bank of Darlington v. McDonald, 202 S. C. 244, 24 S. E. 2d 369; Shingleton Bros. v. Lasure, 122 W. Va. 1, 6 S. E. 2d 252. We believe that this rule is salutary and should be adopted here.

As to (c), it is apparent that existence of a concerted pattern of persuasion on the part of Parke-Davis' detail men generally in their encounters with physicians lends credence to Levin's testimony and was properly admitted in corroboration thereof.

With this background in mind, it can be seen that Dr. Magee's testimony was properly admitted to lay bare the bones of both Parke-Davis' intensive efforts to promote the use of Chloromycetin and the full extent of the success of those efforts. Dr. Magee's de-

scription of his personal encounter with Parke-Davis' detail men was but a small tile in the total mosaic of the overall promotional scheme and can hardly be deemed to have prejudiced Parke-Davis. Dr. Magee's personal experience only mirrored what he observed of Parke-Davis' detail men in medical meetings and on other occasions. For this reason we hold that Dr. Magee's testimony in all particulars was properly admitted in evidence by the trial judge.

In support of its motion for judgment n.o.v., Parke-Davis contends that there was no competent evidence adduced at trial on which the jury could base its finding that the Chloromycetin prescribed by Levin was the proximate cause of Mary Ann's death. It argues that since none of the several expert witnesses produced at trial were able to state with the requisite certainty which dose of Chloromycetin, that prescribed by Cucinotta or by Levin, or both, caused Mary Ann's death, the jury's finding that it was the dosage of both which was responsible for her death was necessarily conjectural and improper. In advancing this argument, Parke-Davis poses a question which, to our knowledge, is one of first impression in Pennsylvania; *viz*, where the evidence indicates that an injury or death is the result of one of two independent causes or of the two acting in combination but the precise cause is not susceptible of proof, may the jury be permitted to find against both jointly? In our view the answer is in the affirmative. Although no cases on this question have been decided by our courts, our research discloses that a substantial body of decisional law has been developed in other jurisdictions, and that the majority, and in our opinion the better-premised, rule is that fault in such situations may be apportioned equally.[9]

---

[9] Thirteen jurisdictions, including New York and California, have adopted the rule. See 5 A. L. R. 2d 98.

For the foregoing reasons, we are convinced that the trial judge did not err in permitting the jury to apportion fault equally between Cucinotta and Levin. We thoroughly discountenance the rule urged upon us by Parke-Davis that both malefactors should be excused from responsibility for their acts because the precise causal link cannot be established with Euclidian accuracy. Such a rule obviously would be unworthy of our modern concepts of justice.

Parke-Davis also argues that the trial court erred in charging the jury that it would be held liable if it was found that the administration of Chloromycetin was the result of overpromotion of the drug of Parke-Davis. Frankly, we are hard pressed to understand this complaint. Overpromotion formed the main thrust of plaintiff's case; it was relevant to the issue of the effectiveness of the warnings contained in the advertising literature as well as to the question of the scope of authority of Parke-Davis' detail men. The charge, therefore, was entirely proper.

## CUCINOTTA

Cucinotta's first and principal argument is that the trial court erred in submitting to the jury the question of his negligence in his treatment of Mary Ann. He urges that, in light of the testimony by Dr. Magee that most physicians in the Philadelphia area would have prescribed Chloromycetin under the same circumstances as did Cucinotta, there was no evidence upon which the jury could have based its finding that he was negligent. We hold this argument to be untenable. The standard of care required by a physician or surgeon has become one of the well-settled axioms of our evidentiary law: The burden of proof in a malpractice action is upon plaintiff to prove either (1) that the physician or surgeon did not possess and employ the required skill and knowledge, or (2) that

he did not exercise the care and judgment of a reasonable man in like circumstances; and that the injury complained of either (1) resulted from a failure on the part of the physician or surgeon to possess and employ the required amount of skill and knowledge, or (2) resulted from his failure to exercise the care and judgment of a reasonable man in like circumstances: Donaldson v. Maffucci, 397 Pa. 548 (1959).

Cucinotta apparently does not contend that the affirmative testimony of plaintiffs' expert medical witness, Dr. Magee, failed to meet the standard of proof. Rather he argues that the further testimony of both Dr. Magee and Dr. Weston to the effect that a substantial number of physicians in the Philadelphia area would have followed the same procedure as did Cucinotta destroys the probity of their earlier testimony that Cucinotta's treatment was improper.

As heretofore indicated, we find this argument to be untenable. First, we have been unable to find, nor has Cucinotta pointed out to this court, any decisional precedent for the proposition he here advances. His argument overlooks a fundamental difference between the proof required to support the alternative bases of malpractice set down in the Donaldson case. If plaintiffs are proceeding on the theory that Cucinotta's malpractice consisted of his lacking the required skill and knowledge of physicians in the same or similar locality, then proof that a substantial number of physicians in the community possessed and employed the care and skill of Cucinotta would have obvious relevancy to the question of his malpractice. However, in the instant case, plaintiffs are proceeding on the alternative theory set down in the Donaldson case, to wit, that Cucinotta, while perhaps possessing and employing the required skill and knowledge, did not exercise the care and judgment of a

reasonable man in like circumstances. Clearly, with respect to the second theory of malpractice, the fact that a substantial number of physicians in the community would have pursued the same procedure has no relevancy whatsoever. To accept Cucinotta's argument in this regard in our view would promulgate a rule of self-vindication which we cannot accept, viz., that a physician may be excused from the consequences of his actions, no matter how improper, if he can show that those actions were commonplace among his professional brethren. The more widespread the improper actions in the profession, the greater the immunity from redress. Such a rule obviously contravenes the fundamentals of civil practice.

The testimony of Doctors Magee and Weston in this case gave strong support to the inference that the treatment rendered by Cucinotta was not proper, and the jury's determination that Cucinotta was negligent had ample support in the record.

Cucinotta also contends that the trial court erred in refusing to admit in evidence statements contained in the hospital records which went to the question of the dosage of Chloromycetin administered to Mary Ann prior to her death. Cucinotta argues that since the hospital records were authenticated by agreement of all counsel, everything contained therein should have been introduced into the trial record. With this, we disagree. It is clear that agreement of the parties was only to obviate the requirements of producing a witness to authenticate the hospital records. Nowhere is it indicated that any of the attorneys intended thereby to waive the rules of evidence. Thus, the statements referred to by Cucinotta, in order to be admissible, were required to withstand the test of the evidentiary rules; in this, they clearly fail. The statements, as they appeared in the record, gave no indication of their source or to whom they could be

attributed. Obviously, they constituted hearsay and were properly withheld from evidence.

Moreover, we can see no possible prejudice to Cucinotta in the failure of the trial court to admit these statements, as other evidence was admitted into the record which established the same facts which Cucinotta hoped to prove through the statements contained in the records. The admission of the latter would merely have been repetitive.

It is to be noted that Cucinotta made no mention of the excessiveness of the verdict in his motion for new trial and for judgment n.o.v. and under the four-day limitation of C. P. Rule ★253, it has now been waived: Dunn v. Hatch Motors Co., 281 Pa. 224 (1924). Regardless of any such waiver, it is our opinion that, when all the facts of the case are considered, the verdict is not excessive.

Levin's motions traverse several of the arguments of Cucinotta and, hence, will not be discussed independently here.

## DAMAGES

Finally, defendants, Parke-Davis and Cucinotta, move for a new trial on the ground that the jury was improperly instructed with respect to the question of damages. While conceding that the charge was correct according to the holding in Radobersky v. Imperial Volunteer Fire Department, 368 Pa. 235 (1951), they argue that the better rule is the one laid down in Murray v. Philadelphia Transportation Company, 359 Pa. 69 (1948). Without taking a position on the respective merits of the holdings in the Radobersky and Murray cases, supra, we can only state that the trial court was bound to follow the latest pronouncement of the Supreme Court on the question of damages, and was thus correct in charging the jury in accordance with the Radobersky case.

## CONCLUSION

Accordingly, for the reasons hereinbefore stated, we dismissed the motions of additional defendants for a new trial and for judgment n.o.v.