Incollingo *v.* Ewing et al., Appellants.

267

Argued November 20, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Edward W. Madeira, Jr.,* with him *James T. Giles,* and *Pepper, Hamilton & Scheetz,* for appellant.

*Francis E. Shields,* with him *Dolores B. Spina,* and *Pepper, Hamilton & Scheetz,* for appellant.

*William B. Freilich,* with him *Joseph R. Livesey, James M. Marsh,* and *LaBrum and Doak,* for appellant.

*William C. Hewson* and *James E. Beasley,* with them *Beasley, Albert, Hewson & Casey,* for appellees.

OPINION BY MR. JUSTICE POMEROY, January 25, 1971:

We have before us three appeals from the judgments entered on jury verdicts in favor of plaintiffs, the parents and administrators of the Estate of Mary Ann Incollingo (herein "Mary Ann"), a minor, on account of injuries to and the death of the minor allegedly caused by the wrongful administration of the drug known as Chloromycetin, a trade name for Chloramphenicol, a broad spectrum antibiotic.[1] The original defendant was Peirce G. Ewing, a druggist, the complaint charging that he negligently provided Chloromycetin without prescription. Ewing joined as additional defendants Domenico Cucinotta, M.D., Samuel Levin, D.O., and Parke, Davis and Company (Parke, Davis).[2] The third party complaints against both Dr. Cucinotta and Dr. Levin alleged that they had caused or contributed to the injuries of the minor plaintiff by negligently prescribing Chloromycetin in disregard of its possible dangerous side effects. The third party complaint against Parke, Davis, the manufacturer of the drug, alleged that it negligently failed to warn the plaintiffs, the defendant and the additional defendants of the dangerous effects of the drug, failed to perform proper tests on the drug, and failed to take necessary precautions to avert the injuries complained of. After a

---

[1] Suit was instituted in February 1962 during the lifetime of the minor by her, her father as guardian, and by both parents in their own right. Mary Ann died the following month. Her parents were duly appointed administrators of their daughter's estate and were substituted for her as plaintiffs in the action.

[2] There was another additional defendant, Lederle Laboratories, Division of American Cyanamid Company, but at the outset of trial a voluntary nonsuit was entered as to this additional defendant by agreement of all parties.

lengthy (7 week) trial, a jury verdict was returned in favor of the original defendant, Ewing,[3] and against all additional defendants in the sum of $215,000. The verdict was comprised of $200,000 to Mary Ann's estate and $15,000 to her parents in their own right. Motions for judgments notwithstanding the verdict and, alternatively, for a new trial, filed by each additional defendant, were refused and judgments entered on the verdicts, and from such judgments these appeals were taken. We affirm.

Following is an abbreviated recitation of the facts giving rise to the suit. Mary Ann was born on December 29, 1955. Dr. Cucinotta was her pediatrician and first saw her five days after birth. In the four years following he saw and treated Mary Ann for the ordinary childhood diseases. In October, 1958 and again in July, 1959 he saw Mary Ann for a condition he diagnosed as "acute catarrhal rhinopharyngo tonsillitis." On the latter occasion he noted a "complicating abdominal pain, possibly mesenteric adenitis" (an infection of the mesentery glands of the stomach). He considered her condition to be caused by a staphylococcus aureus coagulose positive infection. On both occasions he prescribed Chloromycetin, and the child responded well. On January 22, 1960, some six months later, her parents brought Mary Ann to the doctor's office. Dr. Cucinotta made the same diagnosis, and again prescribed Chloromycetin. The prescription was for 2 ounces, and could be refilled but once. At no time did Dr. Cucinotta take blood tests or make bacteriologic cultures.

In February, 1960 Mary Ann's mother felt that Mary Ann had a respiratory infection (she had de-

---

[3] Mr. Ewing had died prior to commencement of trial, and his executor was substituted as defendant. A pretrial deposition given by Ewing was introduced in evidence.

veloped a cold and some hoarseness). Mrs. Incollingo asked Ewing to refill the January 22 prescription of Chloromycetin. One refill having already been furnished, Ewing told her that a physician's authorization would be required. According to Dr. Cucinotta, Ewing telephoned him to ask if the prescription could be refilled, and he answered in the negative. Mrs. Incollingo then called Dr. Levin, an osteopathic physician of whom she was a patient, asking that he authorize renewal of the prescription. Dr. Levin testified that Mrs. Incollingo told him Dr. Cucinotta was not available. Without seeing or examining Mary Ann, Dr. Levin telephoned Ewing and authorized a refill of the prescription. At least one additional refill of the prescription was obtained in the same manner. Mrs. Incollingo did not administer the medicine to her daughter in accordance with the prescription instructions, but as she felt Mary Ann needed it.

In May, 1960 Mrs. Incollingo again brought her daughter to Dr. Cucinotta, who found her to be suffering from aplastic anemia, a form of blood dyscrasia. His diagnosis at the time was that this was secondary to (i.e., resultant from) Chloromycetin. Mary Ann's condition gradually worsened until her death in March, 1962. Although in his testimony Dr. Cucinotta qualified the causative role of the drug to "most probably" giving rise to the anemia, there was no real medical disagreement at trial that Chloromycetin was in fact the underlying cause of Mary Ann's death.

At this point it is necessary to describe briefly the nature of the drug here involved. As mentioned at the outset, Chloromycetin is a "broad spectrum" antibiotic, meaning that it is efficacious in the control and cure of a wide range of infectious diseases. Parke, Davis first offered Chloromycetin for sale in 1949 and was the sole producer until 1967. Chloromycetin was prop-

erly obtainable only upon the prescription of a licensed physician, and was not advertised to the general public. Because of its therapeutic effectiveness and low incidence of side effects, such as nausea and vomiting, Chloromycetin became a popular, widely used drug. Prior to and during the period that Chloromycetin was prescribed for Mary Ann the following language appeared on the immediate container and the outer carton: "WARNING—Blood dyscrasias [disorders] may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made. CAUTION—Federal Law prohibits dispensing without prescription." In addition, the literature distributed by Parke, Davis pertaining to the drug contained the following statement: "Chloromycetin is a potent therapeutic agent and, because certain blood dyscrasias have been associated with its administration, it should not be used indiscriminately or for minor infections. Furthermore, as with certain other drugs, adequate blood studies should be made when the patient requires prolonged or intermittent therapy." There is no question that the foregoing quotations, based on a Federal Food and Drug Administration announcement, were correct statements of fact as far as they went; there was, however, considerable dispute at trial as to whether they were sufficiently explicit and went far enough in describing the dangerous potential toxicity of the drug, whether they were given sufficient prominence on the containers and in the Parke, Davis literature, and whether the printed warnings were not in effect counteracted by the alleged overpromotion of the product by Parke, Davis salesmen, called in the trade "detail men".

With the foregoing general background in mind, we turn to the contentions of appellants. While the case was not separated as to the several defendants at trial, they have raised on appeal somewhat different issues as to liability, and we shall for convenience discuss

them separately. A common question as to damages will be treated thereafter.

### 1. The Case as to Dr. Cucinotta

Appellant Cucinotta's argument in support of his motion for judgment n.o.v. is that plaintiffs did not carry their burden of proving that his conduct was not in accordance with the accepted standards of the medical profession in Philadelphia in 1960. By the same token, a primary argument in support of his new trial motion is that the trial judge erred in his charge to the jury as to what constitutes malpractice.

Dr. Cucinotta, called by plaintiffs as for cross-examination, testified that he considered Mary Ann's condition on January 22, 1960 to be a serious one requiring immediate therapy which could not be withheld until his clinical diagnosis could be confirmed by laboratory tests, and that in view of this condition it was his judgment that Chloromycetin was the appropriate drug to prescribe. Upon the two occasions in 1958 and 1959 when he had prescribed Chloromycetin for the same condition, Mary Ann had responded well and had shown no signs of adverse effects from the drug. He stated that it was because he was aware of the possible side effects of the drug that he had prescribed a small amount to be given within a short period of time, and that he refused to renew the prescription when asked to do so by Mr. Ewing. He stated that his treatment of Mary Ann was in accordance with the prevailing standards of the medical profession in Philadelphia at the time.

Dr. Cucinotta asserts that no evidence was introduced to the contrary as to the practice in the profession. Indeed, as he points out, the plaintiffs' chief expert witness, Dr. Edward H. McGehee, testified that

in his opinion 75% to 80%[4] of the practicing physicians in Philadelphia in the period 1958-1960 would have prescribed Chloromycetin for Mary Ann's condition, and approximately 50% of these would have done so without taking a throat culture. Another of plaintiffs' experts, Dr. James P. Weston, testified that Dr. Cucinotta was practicing "the same way as a majority of his colleagues were at that particular time." While plaintiffs' medical witnesses attributed this practice to the widespread use of the drug brought about by the promotional efforts of Parke, Davis, as well as to the general effectiveness of the drug, Dr. Cucinotta testified that he received no impression, when visited by the Parke, Davis detail men, that Chloromycetin could be used with impunity, was not influenced by salesmanship of the manufacturer in his use of the drug, and was aware that it should be used only in serious cases.

From this testimony Dr. Cucinotta argues that he is exonerated from any liability in light of this Court's holdings in a number of malpractice cases, especially that in *Donaldson v. Maffucci,* **397 Pa. 548, 156 A. 2d** 835 (1959). We there stated:

"In the absence of a special contract, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment [citations omitted]. A physician who is not a specialist is required to *possess* and *employ* in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man. However, a physician or surgeon is not bound to employ any particular mode

---

[4] Dr. Cucinotta agreed with this 75%-80% estimate. Dr. McGehee later modified these percentages to 50% to 75%.

of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or the surgeon to adopt either of such methods: [citations omitted].

"The burden of proof in a malpractice action is upon the plaintiff to prove either (1) that the physician or surgeon did not *possess* and *employ* the required skill and knowledge or (2) that he did not exercise the care and judgment of a reasonable man in like circumstances; . . ."

The point which Dr. Cucinotta overlooks in his reliance on *Donaldson v. Maffucci* is the disagreement of plaintiffs' experts with his view that Mary Ann's condition on January 22, 1960, and also at the times of the 1958 and 1959 prescriptions, was serious. They characterized it as relatively trivial, a mild form of upper respiratory infection, not warranting the employment of Chloromycetin. Dr. McGehee stated that coagulase positive, staphylococcus aureas pharyngitis cannot be diagnosed by a clinical examination of the patient's throat, and therefore a culture is necessary to establish the diagnosis; he also gave the opinion that mesenteric adenitis is a common condition, that it cannot be ascertained by external palpation; and that in any case it requires no treatment.[5] His opinion was, accordingly, that the use of Chloromycetin in Mary Ann's situation was not reasonable medical treatment in the Phil-

---

[5] While Dr. Alice Stowell, the expert witness called by Dr. Cucinotta, stated her opinion that in 1960 the drug was appropriate for the treatment of mesenteric adenitis, and that its appropriateness for acute pharyngo tonsillitis depended on the degree of severity—a judgment decision which she believed was validly made, we must, of course, consider the testimony in the light most favorable to the verdict winners.

adelphia medical community[6] in the 1958-1959 period. Dr. Weston also testified that laboratory tests, not clinical examination, would have been required to make the diagnoses in question, and this view had support from Dr. Levin and his expert witness, Dr. John W. Frost. Moreover, the warning on the label and package of Chloromycetin stated that "adequate blood studies should be made when the patient requires prolonged or intermittent therapy." Dr. McGehee's opinion was that the three courses of treatment ordered by Dr. Cucinotta, those in 1958, 1959 and 1960, constituted intermittent use of the drug, for which blood studies were required.

The testimony to the effect that a large percentage of Philadelphia doctors would have given the same course of treatment as did Dr. Cucinotta was based on the opinions of plaintiffs' experts that Chloromycetin was being misused for trivial complaints by doctors who did not read or pay attention to the warnings or who had been "oversold" by the drug company's detail men. Dr. Cucinotta did not fit into these categories; he had read the warnings, he knew of the dangers, he had not been oversold. The dispute as to Dr. Cucinotta's conduct, therefore, narrows down to the accuracy of his diagnosis, and whether it could or could not have been made clinically; to the interpretation of "intermittent" use, and whether blood tests were or were not mandated in light of three courses of treatment of the

---

[6] The standard of skill and knowledge required of a physician has traditionally been equated, in Pennsylvania and elsewhere, to that possessed and employed by physicians generally in the same or a similar locality or community as the physician whose conduct is in question. The current validity of this geographical limitation of the standard of professional conduct is not presented by this case and has not been briefed or argued by any party. We do not by this decision intend to express any opinion one way or another as to whether this limitation should be continued.

drug separated by roughly six and nine months, respectively. There was no testimony that, given Dr. Cucinotta's knowledge and awareness, a substantial number of doctors at the time and place would have followed the same procedures. Thus Dr. Cucinotta, rejecting the indiscriminate use of the drug which, it was said by plaintiffs, was then characteristic of the medical profession in Philadelphia, could not limit his own responsibility to the skill and knowledge of the norm, see Restatement (Second) Torts, §290, comment *f* and §299, comment f; and in exercising the knowledge he himself possessed, he was required to employ the care and judgment of a reasonable man in like circumstances. This standard of care is distinctly recognized in *Donaldson* in clause (2) of the last paragraph above quoted. It was adherence to this standard which was put in issue by the testimony of plaintiffs' witnesses; this testimony was sufficient to take the case to the jury as to Dr. Cucinotta.

What has been said above is similarly dispositive of the asserted error in the trial judge's charge as to Dr. Cucinotta. The court was asked to charge (the 5th and 18th points for charge submitted on behalf of the doctor) that if, in prescribing Chloromycetin for Mary Ann, Dr. Cucinotta acted as a substantial number of physicians in Philadelphia would have acted under the same circumstances, the verdict must be in his favor; again, that if a substantial number of physicians in Philadelphia would have treated Mary Ann as did Dr. Cucinotta without taking a throat culture, it cannot be found that the doctor was negligent in not doing so. These requests, which were refused, did not advert to Dr. Cucinotta's knowledge and awareness of the dangerous propensities of the drug, and of the warnings issued with respect thereto. The court charged that it was for the jury to determine "taking into considera-

tion the testimony given to you by the doctors who testified," whether Dr. Cucinotta's conduct fell below the reasonable standard of medical care, "despite the number of doctors who would have done the same thing." We find no error in these rulings or the charge under these circumstances.

Two other points raised by Dr. Cucinotta, both in support of his new trial motion, require but brief mention. The first pertains to the allowance into evidence of testimony relating to the condition of Mary Ann and his treatment of her subsequent to the January 22, 1960 prescription referred to in the original complaint, i.e., after the diagnosis of aplastic anemia in May, 1960. This consumed a period of several days out of the total period Dr. Cucinotta was on the stand as on cross-examination, and is alleged to have been not only an harassment of the witness but inflammatory of the jury. While originally directed to showing malpractice in the doctor's treatment of aplastic anemia, this was a cause of action clearly not embraced by the pleadings, and was an approach eventually abandoned by the plaintiffs. The jury was informed by the trial judge that the treatment pertaining to this phase of the disease was not to be considered as any evidence of negligence. The testimony dealing with the effects of blood dyscrasia and its treatment was in the main relevant as to pain and suffering over a two year period, and properly for the jury on this basis. While unduly prolonged, we cannot say that the cross-examination was so prejudicial as to warrant a new trial.

The other charge of trial error urged upon us is refusal to allow into evidence the complete hospital records relative to Mary Ann's seven admissions under Dr. Cucinotta's care. The records were in court and stipulated by counsel to be authentic, and they were used as the basis for much of the cross-examination of

Dr. Cucinotta. Dr. Cucinotta's position is that the histories in the records showed Mrs. Incollingo's statements as to the number of refills of Chloromycetin which she had obtained through Dr. Levin were thus relevant on the disputed question of causation, and were admissible under the business records exception to the hearsay rule, now embodied in the Uniform Business Records as Evidence Act. Act of May 4, 1939, P. L. 42, §2, 28 P.S. §91b. The problem is, however, that no party to the action nor any other person responsible for the hospital entries in question is known to have given the information on which the histories were based. See *Fauceglia v. Harry*, 409 Pa. 155, 185 A. 2d 598 (1962). The statements may have been made by Mrs. Incollingo, but the court was within the discretion allowed it by the Act in not permitting a good guess to take the place of proof of the source. No other hearsay exception has been advanced as ground for the admission of the records.

Beyond this, however, there was no prejudice in the exclusion. While Mrs. Incollingo and Dr. Levin both testified that only two bottles of Chloromycetin were obtained by Mrs. Incollingo through Dr. Levin, there was other testimony that more than two were obtained. In Mrs. Incollingo's deposition she stated that she had called Dr. Levin three or four times relative to Chloromycetin; Mr. Incollingo testified the medicine was given on "many, many occasions"; Dr. Cucinotta himself testified there may have been as many as seven refills after January 22, 1960. Thus the main purpose sought to be served by the medical histories were fulfilled otherwise.

We conclude that the court *en banc* below was correct in denying the motion for a new trial filed by Dr. Cucinotta.

## 2. The Case as to Dr. Levin

Dr. Levin's defense is in sharp contrast to that of Dr. Cucinotta. It is in effect a confession and avoidance. He admits that he paid little or no attention to the written warnings relative to Chloromycetin, that he prescribed the drug extensively and indiscriminately for all kinds of viral infections, whether serious or not; and that he authorized two refills of Chloromycetin for Mary Ann by telephone, without ever having had her as a patient or examining her at the times of the authorizations. Dr. Levin seeks to avoid any liability for this course of conduct in that he felt Chloromycetin was a safe drug because of the representations of the Parke, Davis detail men and because the drug had never caused any trouble on the numerous prior occasions that he had prescribed it; that he knew Dr. Cucinotta and relied on the soundness of his prescription of the drug for Mary Ann; and that Mrs. Incollingo was a patient of his and he wanted to accommodate her, and she told him that she could not then contact Dr. Cucinotta.[7]

---

[7] Dr. Levin's testimony as to ordering a refill of the Chloromycetin prescription on January 22, 1960, was as follows: "A. . . . The mother of the child called me on the telephone and told me that her child was ill under the care of Dr. Cucinotta, whom I knew, that unfortunately she couldn't get in touch with him and would I be good enough to renew the prescription he was giving her for a sore throat. Since the mother was my patient and I felt it was a good—I didn't want to offend her. She was a very good patient of mine, and the child was ill and I felt okay, I would do a good Samaritan deed and refill the prescription for her. Q. Did you feel the drug would be a good one? A. Yes. Q. An effective one? A. Yes, I did. It was a safe drug, and since Dr. Cucinotta used it I felt that he knew what he was doing, and I renewed it for her. Q. Were you concerned about the toxicity of the drug? A. No, I was not. Q. Why were you not? A. Because up to that time the drug was considered to be very safe, and there was no reason for me to suspect any toxicity."

When asked whether in his opinion "it was an exercise of reasonable and accepted practice by physicians in the Philadelphia community between 1958 and 1960 to order antibiotics over the telephone without seeing the patient", Dr. Levin replied in the affirmative. As reasons for this opinion he stated that the patient perhaps couldn't afford to come to the office, might be too ill to come, or "it may be part of a joint practice" for a second doctor to renew a prescription written by his colleague who may be away. Distance or weather might also be factors, he said.

Except for the fact that Mary Ann was reportedly sick, none of these extenuating circumstances was here present. In March Dr. Levin was again called by Mary Ann's mother, who said the Chloromycetin wasn't helping the child, that she preferred Achromycin. She asked the doctor to get it for her. "She was steering the entire therapy," said Dr. Levin, "so I acceded to her wishes." In April Mrs. Incollingo called yet another time, asserting that Mary Ann's physician could not be reached, that the child had a virus again, and a sore throat, and that she would like to have the Chloromycetin prescription renewed once more. "I told her," said Dr. Levin, "I would be glad to do it this one time, but I didn't think I would care to renew it again because I felt this was a dangerous drug to be kept on using, to keep on using."

There was testimony that the indiscriminate use of Chloromycetin was widespread in the community at the time. There was also testimony critical of Dr. Levin's treatment by Dr. Cucinotta and by Dr. Howell, a hemotologist called on behalf of Dr. Cucinotta, but it did not go to the extent of stating that what he did violated the standards of the profession at the time. This is not, however, an end of the matter. Under the *Donaldson* formulation, quoted above, the standard of possessing and employing the skill and knowledge "usually

possessed by physicians in the same or a similar locality" is qualified importantly by the phrase "giving due regard to the advanced state of the profession at the time of the treatment." It is also an integral part of our rule that in employing the requisite skill and knowledge, the doctor must "exercise the care and judgment of a reasonable man." In this case, it is clear that full information relative to Chloromycetin was available in medical literature, and indeed that Dr. Levin read materials other than Parke, Davis literature. Was Dr. Levin using the care and judgment of a reasonable man in renewing prescriptions of a drug, the propensities of which were readily ascertainable, for a person who was not his patient, whom he had never seen, as a favor to her mother whose good will as a patient he wished to retain? There was no evidence that this course of conduct was in accord with the professional standard of conduct in the community at the time. A review of the record satisfies us that this question was fairly raised by the evidence, and that its resolution was for the jury.

It is argued on behalf of Dr. Levin that "unlike other areas of negligence, in a malpractice action, the medical profession sets its own standard of conduct by establishing its own custom of practice." This would be to say that as long as a course of conduct, however unreasonable by ordinary standards, is the norm for the group, all members of the group are thereby insulated from liability so long as they do not deviate therefrom. That is not the law. It is true, as Chief Justice MAXEY stated in *Hodgson v. Bigelow,* 335 Pa. 497, at 518, 7 A. 2d 338 (1939), that "A departure from established standards of practice, unless justified by circumstances, often makes out a prima facie case of malpractice"; it does not follow that a prima facie case of malpractice *cannot* be made out if there has been no departure from the norm. In the words of Mr. Justice HOLMES in an-

other context, "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." *Texas & Pacific Railway Co. v. Behymer*, 189 U.S. 468, 470, 47 L. Ed. 905 (1903), quoted in *Forry v. Gulf Oil Corp.*, 428 Pa. 334, 342, n.10, 237 A. 2d 593 (1968) (a product liability case). Thus, the statement that "A physician is required to exercise only such reasonable skill and diligence as is ordinarily exercised in his profession", as given in our opinion in *Duckworth v. Bennett*, 320 Pa. 47, 50, 181 Atl. 558 (1935), *Saltzer v. Reckord*, 319 Pa. 208, 212, 179 Atl. 449 (1935), and other cases is not to be taken in isolation, and in disregard of the admonition to give due regard to the advanced state of the profession and to exercise the care and judgment of a reasonable man in the exercise of medical skill and knowledge. The quoted statement is true within its intended limits and is based on the lack of inherent medical competency of a lay jury. It was not intended to prevent a jury from weighing professional expert opinion as to whether or not a particular act or treatment was done with reasonable care and judgment, where there is no clear evidence of custom. Thus, for example, in *Davis v. Kerr*, 239 Pa. 351, 86 Atl. 1007 (1913), where a sponge was left at the site of an operation, this Court disapproved a charge which would have exonerated the defendant doctor "if you find that the practice or custom to have the nurses count the sponges is a reasonable and proper custom or practice." Said the Court, "The instruction not only misconceives the purpose and object of the rule or practice, but treats it as a rule defining the whole duty of a surgeon, limiting his responsibility accordingly." The Court held, to the contrary, that responsibility could not be so limited by custom, and that there was a duty on the surgeon before the counting of the sponges by the nurses

began so "to employ his skill or observation [as] to assure himself that no foreign substance had been allowed to remain within." (p. 357) It was held that the proper inquiry was, "In a word, did he do all that reasonable care and skill would require?" (p. 358) That inquiry was equally pertinent as to Dr. Levin in the instant case.

Dr. Levin in effect argues that he should have been exonerated as a matter of law because the information disseminated by Parke, Davis concerning its drug was "ambiguous, inadequate and incomplete in the light of the knowledge possessed by Parke, Davis", and that therefore the medical profession, and particularly he himself, was caused to use Chloromycetin indiscriminately. Dr. Levin testified that "the drug was considered to be very safe, and there was no reason for me to suspect any toxicity." He stated he was aware of the warnings in the precautionary statements on the wrapper of the drug, "but the drug detail men practically ignored it. It was played down . . . we didn't concern ourselves with this small inadequate description [of warnings]". We decline to accept the proposition that a qualified doctor can so easily turn himself into a dupe. As indicated heretofore, the Parke, Davis warnings were there to read if he would, and the dangers of the drug were by 1960 also revealed in other medical literature to which the doctor had access and which he said he read. Indeed, as quoted above, the doctor at one point testified that the drug was dangerous "to keep on using". The court below was correct in not permitting him to take refuge behind the asserted liability of the manufacturer.

Dr. Levin argues, finally, that no causal connection was established between the doses of Chloromycetin he prescribed and the minor plaintiff's aplastic anemia; that the damage had already been done before the administration of the doses which he authorized. In light

of all the evidence, including the pathological findings from a post-mortem examination, there could be no substantial doubt that the immediate cause of death was aplastic anemia induced by Chloromycetin. This established, it became defendants' burden to prove which series of dosages—those of Dr. Cucinotta or Dr. Levin or of both—were the fatal ones. Although the evidence appears to have been stronger that it was Dr. Cucinotta's dosages rather than those authorized by Dr. Levin which were the causative agent, it was not sufficient as a matter of law to rule out Dr. Levin's dosages as a contributory causative factor. Thus the matter was properly submitted to the jury[8] and its verdict that both doctors were jointly liable is factually supportable. See *Restatement (Second) of Torts*, §433B(2) and (3); cf. Harper and James, *Torts*, §10.1, p. 702 (1956); *Snoparsky v. Baer*, 439 Pa. 140, 266 A. 2d 707 (1970).

### 3. The Case as to Parke, Davis

As indicated earlier, the third party complaint against Parke, Davis asserted that it "did so negligently and carelessly manufacture the said drug . . . as to properly [sic] warn, direct and/or instruct parties in interest of possible effect of the said product;" also, that Parke, Davis "did so carelessly and negligently fail to warn the plaintiffs, the defendant and other parties to this action of the dangerous effects of the said drug and did further fail to perform proper tests

---

[8] The court correctly charged on this point: "On the other hand, if you accept testimony of Dr. Weston and Dr. Magee [sic] that it is impossible to determine which dosage caused Mary Ann's condition, then you may conclude that it was the combined dosage of Dr. Cucinotta and Dr. Levin which proximately caused Mary Ann's aplastic anemia, and your verdict would be in favor of plaintiffs against both Dr. Cucinotta and Dr. Levin, providing you also find Dr. Levin was negligent in ordering the refilling of the drug."

on the said drug and take the necessary precautions to avert the injuries complained of by the plaintiffs." There was no evidence of negligence in the manufacture of the drug or of failure to perform proper tests. Thus the complaint was based on an alleged negligent failure to warn the parties to the action of the dangerous effects of the drug.

Parke, Davis contends that there was no competent evidence to support the verdict against it, and that therefore judgment n.o.v. should have been entered. In addition, it asserts various trial errors and errors in instructions to the jury which were sufficiently prejudicial as to warrant the granting of a new trial as to it.

The argument in support of judgment n.o.v. is (1) that its warning relative to Chloromycetin was adequate as a matter of law, (2) that in any event its warning was, by Dr. Cucinotta's own testimony, adequate as to him, and (3) that although portions of Dr. Levin's testimony, if believed, would support a finding that he had not been properly warned, the evidence failed to show that the dosages of the drug administered by Dr. Levin were the effective cause of Mary Ann's death. While we agree that on the record nothing that Parke, Davis did or failed to do had a material influence on Dr. Cucinotta's prescription of the drug, we do not agree, as indicated heretofore, that there was insufficient showing that Dr. Levin's dosages could have contributed to Mary Ann's injuries and death. The question, therefore, narrows down to whether the warnings relative to the drug were adequate as to Dr. Levin. Here we think that on the basis of Dr. Levin's testimony there was enough evidence to take the case to the jury.

There is no question that manufacturers of potentially dangerous drugs are held to a high degree of care. As this Court said in *Henderson v. National*

*Drug Company,* 343 Pa. 601, 610, 23 A. 2d 743 (1942), ". . . the public interest requires the holding of companies which make and sell drugs and medicine for use in the human body to a high degree of responsibility under both the criminal and civil law for any failure to exercise *vigilance* commensurate with the harm which would be likely to result from relaxing it." The Court went on to say, however, that this consideration did not justify the courts in lowering the standards of proof in cases of this kind. "If we did so, the public interest would be ill served." Thus, neither the law of Pennsylvania, nor, so far as we are aware, the law of other states has imposed strict liability upon a drug manufacturer merely because of dangerous propensities of the product.

Section 402A of the *Restatement (Second) of Torts* imposes strict liability on the seller of any product "in a defective condition unreasonably dangerous to the user or consumer." This section has been adopted as the law of Pennsylvania. *Webb v. Zern,* 422 Pa. 424, 220 A. 2d 853 (1966). Comment *h* to the section makes it clear that a product, as to which adequate warning of danger involved in its use is required, sold without such warning is in a "defective condition." Comment *j* states that "in order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." The comment continues: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition nor is it unreasonably dangerous." The Restatement reaches the same conclusion as to a product which is incapable of being made safe for its intended use, such as new or experimental drugs, as to which, because of lack of time and opportunity for sufficient medical experience there can be no assurance of

safety, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. "The seller of such products", concludes this comment (Comment *k*), "again with the qualification that they are properly prepared and marketed *and proper warning is given,* where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product attended with a known but apparently reasonable risk." (Emphasis supplied.) Under the evidence, Chloromycetin was a drug in this category.[9] There is no question, and Parke, Davis does not contend, that it could properly be marketed without proper warning of its potentially dangerous side effects. Since the drug was available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor. See *Stottlemire v. Cawood,* 213 F. Supp. 897, 899 (D.C. 1963) (a case involving Chloromycetin). The question, therefore, in this case is whether the warning that was given to the prescribing doctors was proper and adequate. A corollary question is whether, if the printed warning was proper and adequate, it was in effect nullified by the representations of the so-called "detail men".

We think that whether or not the warnings on the cartons, labels and literature of Parke, Davis in use in the relevant years were adequate, and whether or not the printed words of warning were in effect cancelled

---

[9] Since the strict liability rule of §402A is not applicable, the standard of care required is that set forth in §388 of the Restatement dealing with the liability of a supplier of a chattel known to be dangerous for its intended use. Under this section, the supplier has a duty to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous.

out and rendered meaningless in the light of the sales effort made by the detail men, were questions properly for the jury. Action designed to stimulate the use of a potentially dangerous product must be considered in testing the adequacy of a warning as to when and how the product should *not* be used; if detail men are an effective means of selling a product and explaining its nature, a jury could find that they also afforded an effective medium of conveying a warning. Cf. *Sterling Drug, Inc. v. Yarrow*, 408 F. 2d 978, 993 (C.A. 8th Cir. 1969). Defendant Parke, Davis admits that Dr. Levin's testimony would support a finding that he had not been adequately warned by the detail men in 1960 and prior thereto as to the possible association of aplastic anemia with Chloromycetin. We agree, and the jury apparently did so find. We think there was no error in declining to enter judgment in favor of Parke, Davis.

Parke, Davis asserts, further, that the proof at trial was at such substantial variance with the pleadings that either a judgment in its favor notwithstanding the verdict, or at least a new trial, is imperative. The first aspect of this contention has to do with Pennsylvania third party practice, and runs as follows: the original complaint against Ewing, the druggist, was a negligent filling of a prescription contrary to the instructions of the prescribing physician, Dr. Cucinotta; the third party complaint by Ewing against Parke, Davis stated, in effect, that he has was not properly warned about the drug; there was no allegation that Ewing was induced by Parke, Davis' actions to refill the prescription against the doctor's instructions; no evidence to this effect was offered, and indeed plaintiffs offered no proof in support of their complaint of negligence against Ewing; instead, they sought to prove the state of mind of the medical profession at large rather than any duty owed by Parke, Davis to Ewing or the appellees. In the first place, this argument overlooks the

important fact that the third party complaint also asserts a failure adequately to warn the other additional defendants, the two doctors. In the second place, it reads too narrowly the Pennsylvania Rules of Civil Procedure relative to joinder of third parties. Rule 2252(a) permits joinder by a defendant of "any person whether or not a party to the action who may be alone liable or liable over to him on *the cause of action declared upon* or jointly or severally liable thereon with him." (Emphasis ours.) Rule 2255 provides, in paragraph (d), that "the plaintiff shall recover from an additional defendant found liable to him . . . as though such additional defendant had been joined as a defendant and duly served and the initial pleadings of the plaintiff had averred such liability." It is true that "the cause of action declared upon" by the plaintiff in this case was not the same as that set forth in the third party complaint: the negligent filling of a prescription by a druggist is not the same cause of action as the negligent failure by the drug manufacturer to give adequate warning to the druggist or the prescribing doctors. The same could be said in any third party situation. A's cause of action against B, for example, is not the same as A's cause of action against C, joined as alone liable, because a cause of action is by definition between particular named parties. It must be remembered that "[t]he general plan of the joinder procedure is to adjudicate all rights growing out of a certain factual background." 3 Goodrich-Amram, Sec. 2255(d)-9, p. 107; see also the discussion at Sec. 2252(a)-5 and 6. The phrase "cause of action declared upon" as used in the rule may not be taken too literally. So long as the additional defendant's alleged liability is related to the original claim which plaintiff asserts against the original defendant, the third party complaint is within bounds. We think that is the case here: the asserted failure of the manufacturer of the drug to warn the

prescribing doctors and the druggist of its dangers is sufficiently related to the plaintiff's original charge that the druggist negligently dispensed the drug to be within the ambit of third party procedure. Contrast *Mallesky v. Stevens*, 427 Pa. 352, 355, 235 A. 2d 154 (1967). The fact that at trial the plaintiffs concentrated their attack primarily on the third party defendants and hardly at all on the original defendant was not a variance as between pleadings and proof. As noted above, Pa. R. C. P. Rule 2255(d) in effect incorporates by reference in the original complaint the properly pleaded averments of third party liability contained in the third party complaint.

The other aspect of Parke, Davis' argument as to variance is more difficult. As noted, the cause of action pleaded is negligent failure to warn the parties to the action (including particularly the two additional defendants who were prescribing physicians) of the dangerous effects of the drug. There was direct testimony on this subject, including both the printed warning and the promotional efforts of the detail men, by both doctors: Dr. Cucinotta stated, in effect, that he was adequately warned and understood the dangers and proper use of the drug, while Dr. Levin for his part indicated the contrary. Plaintiffs were allowed over objection to introduce, by expert witnesses, evidence directed to showing a failure to warn the *medical profession*. This consisted of the custom and practice of the manufacturer, Parke, Davis, in "overpromoting" its product, primarily through the use of detail men who minimized the dangers of the drug while emphasizing its effectiveness, wide acceptance and use, and lack of certain objectionable side effects associated with other drugs. The question is whether this evidence was properly admitted.

While the question is close, we think the answer is in the affirmative in the setting of this case. The jury

was not obliged to believe the oral, uncorroborated testimony of either doctor. The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug (his memory was vague as to what transpired at visits of detail men to his office) ; and conversely, it would tend to corroborate and lend credence to Dr. Levin's testimony that he was so influenced. As a practical matter, it would have been difficult, if not impossible, to show how the promotional efforts of the manufacturer bore on the judgments of these codefendants without demonstrating that the efforts were directed to the entire class or group of which they were members: the advertisements and all the literature relative to Chloromycetin were directed to the medical profession; the printed warnings were directed to the medical profession; the detail men were engaged for the purpose of selling the drug by making calls upon the members of the medical profession.

The approach of Parke, Davis to the medical profession in general was also relevant in another sense. The evidence indicated such a wide use of Chloromycetin as to suggest that it was not being limited to serious illnesses, and plaintiffs' experts so testified. On this basis the trial court instructed the jury that if it found that Parke, Davis was on notice that the drug was being used indiscriminately, and yet failed to try to restrict its use to proper situations, then the company could be found negligent. We think the charge was proper. When a required warning is retained unchanged in the face of being widely disregarded, and the supplier knows or has reason to know of such wide disregard, a jury may be permitted to find the warning insufficient. Were the evidence limited solely to the two doctors here involved, this approach to the warning problem would not be possible. But the focus must

narrow, of course, from the general to the specific. There was adequate proof that the Chloromycetin ordered by one or both of the doctors in this case was the cause of death; a warning more explicit and more prominent given both by the written and the spoken word to those doctors might, so the jury could have found, have avoided the tragedy which occurred in this case. For similar holdings, see *Sterling Drug v. Yarrow, supra; Parke, Davis and Company v. Stromsodt,* 411 F. 2d 1390, 1400 (C.A. 8th Cir. 1969), *Tinnerholm v. Parke, Davis & Co.,* 285 F.S. 432, 451 (U.S.D.C., S.D.N.Y. 1968), *Love v. Wolf,* 226 Cal. App. 2d 378 (1964), *Love v. Wolf,* 249 Cal. App. 2d 822 (1967).

We return to the assertion of variance. While the complaint could well have been more specific, no attempt was made by appellant to make it so, nor did it plead surprise. The case had been pending for several years before it came to trial, and a number of depositions had been taken.[10] The charge in the complaint, to repeat, was "did fail to warn . . . of the dangerous effects of said drug . . . and to take the necessary precaution to avert the injuries complained of . . ." These allegations "put appellant sufficiently on notice as to what it had to meet; it was not misled to its prejudice." *Nark v. Horton Motor Lines, Inc.,* 331 Pa. 550, 555, 1 A. 2d 655 (1938). See *Butterfield v. Snellenburg,* 231 Pa. 88, 79 Atl. 980 (1911).

---

[10] So far as the record before us shows, no pretrial conference was held in this case pursuant to Pa. R. C. P., Rule 212. We can conceive of no case where such a conference could have been used to better advantage. Properly conducted under the auspices of a judge, the issues could have been simplified, amendments to pleadings considered and made, admissions of fact and of documents obtained, and other agreements reached or orders made to aid in the orderly and expeditious disposition of the case. Nonuse of the pretrial procedure, especially in protracted litigation, is neglect of an effective tool both for the trial of a particular case and for efficient judicial administration.

A final point must be considered as to Parke, Davis' motion for a new trial. Appellant contends that the trial court erred in admitting, over objection, evidence of a subsequent warning (employed in Chloromycetin packaging and literature after Doctors Cucinotta and Levin prescribed the drug for the minor plaintiff). Although precautions taken after the acts complained of are inadmissible for the purpose of proving antecedent negligence, *Baran v. Reading Iron Co.*, 202 Pa. 274, 51 Atl. 979 (1902), such evidence is admissible if competent for any purpose and as long as it is so qualified by instructions to the jury. *Hyndman v. Pa. Railroad Company*, 396 Pa. 190, 152 A. 2d 251 (1959). In the latter case it was held that evidence of the type here in issue is admissible "to show a caution which was not costly or burdensome to the defendant in relation to the risk or danger involved." *Id.* at p. 200. The charge in this case clearly instructed the jury that the subsequent warning "was admitted for the limited purpose to show a caution which was not costly or burdensome to Parke, Davis in relation to the risk or danger involved." The jury was thrice instructed that the 1961 warning was not to be taken as evidence bearing on antecedent negligence. Parke, Davis nevertheless takes exception to the following portion of the charge: "You may ask yourselves whether knowing that, whether having changed the warning in 1961 is the warning that they should have been fully aware of in 1960 and prior thereto [sic]. You may use that as evidence of the fact that they knew or should have known, and could have used that warning which they used in 1961 back in 1960, 1959, and 1958." In reviewing this instruction, "we must look to the charge in its entirety to determine whether or not error was committed and whether that error was prejudicial." *Mount v. Bulifant*, 438 Pa. 265, 265 A. 2d 627 (1970). We are of the opinion that the charge, taken as a whole, adequate-

ly qualified the jury's consideration of this evidence, and cannot say that the quoted language, while it went too far, was prejudicial.

## 4. The Measure of Damages

The final matter for our consideration relates to the lost earnings component in the measure of damages. This action was commenced during the lifetime of the minor plaintiff, Mary Ann, who died shortly after it was instituted. Under the rule in *Radobersky v. Imperial Volunteer Fire Department,* 368 Pa. 235, 81 A. 2d 865 (1951), damages in such a situation are to be awarded on the basis of the deceased plaintiff's anticipated gross earnings, with no deduction of cost of maintenance before reducing the loss of earnings to present worth. Appellants Dr. Cucinotta and Parke, Davis strenuously urge that this Court reevaluate and overrule *Radobersky* and apply the rule of *Murray v. Philadelphia Transportation Company,* 359 Pa. 69, 58 A. 2d 323 (1948). Under that rule the measure of damages would be loss of *net* earning power, i.e., gross earnings diminished by the amount the deceased plaintiff would have had to expend for his own maintenance had he not died, reduced to present worth.[11] It is apparent that the existence of the two rules results in different awards depending on whether suit is brought before or after death of an injured person, without re-

---

[11] The statutory background for the difference in the two rules is noted in *Radobersky* as follows: "[A] different rule as to damages obtains where the action is one which has survived the plaintiff's death by virtue of Sec. 18 of the Act of 1851 (now Sec. 35(a) of the Act of 1917, *supra*) and where the action is instituted by a deceased's personal representative, under the right conferred by the 1937 amendment (Sec. 35(b)) of the Act of 1917, *supra,* for damages to the deceased's estate due to his tortious injury resulting in death." (The current statutory references are to §601 and §603 of the Act of April 18, 1949, P. L. 512, 20 P.S. 320.601 and 320.603.)

gard to actual loss. That this inequality, not required by statute, may be unfair and result in unseemly haste to file suit prior to death is cogently argued by appellants. Appellees argue that the *Murray* rule would foster dilatory pretrial tactics on the part of defendants, seeking to delay suits until an injured plaintiff had died, and that *Radobersky* is justified in the light of the decisional and statutory background. They contend, further, that any overruling of *Radobersky* should be prospective only.

A similar challenge to the validity of *Radobersky* was presented to us in *Evans v. Philadelphia Transportation Co.*, 418 Pa. 567, 212 A. 2d 440 (1965). In that case the question was not raised in the court below, and the pertinent instruction was not specifically challenged at trial. Because of this a majority of the Court were of the opinion that the requested reconsideration of *Radobersky* should not be made on the record then before the Court. In the case at bar the question was raised in the court below in the motions for a new trial, but the record does not show any earlier raising of the question in exceptions to the charge or in points for charge. Only a general verdict was returned, and there is no way of showing, without a retrial as to damages, which would of necessity be lengthy, the amount of maintenance and support which under *Murray* would be deductible. A request for a special verdict might have resulted in an allocation of damages as between pain and suffering and the elements of special damages, including lost earnings, which would have presented the question in a manner not requiring full retrial of the damage issues in a lengthy case. There is no question but that the charge of the court was correct under the law as it exists, and the verdict of the jury is not claimed to be excessive. Under these circumstances and on this record we again decline to reconsider the rules of damages referred to.

Finding no reversible error in the rulings of the lower court, the judgments appealed from are affirmed.

Mr. Justice COHEN took no part in the decision of this case.

---

OPINION CONCURRING IN PART AND DISSENTING IN PART BY MR. CHIEF JUSTICE BELL:

I agree with the Majority that the verdict against Dr. Levin and Dr. Cucinotta must be affirmed. However, I would grant judgment non obstante veredicto for Parke, Davis & Company. The Majority correctly frame the issue of Parke, Davis's liability in terms of the adequacy of the warning given to prescribing doctors. However, it is inconceivable to me how, in the face of the explicit labeling and clear warning on each package of Chloromycetin—"WARNING—Blood dyscrasias may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made."—the Majority can conclude that judgment n.o.v. should not have been entered in the Company's favor. It is an elementary and cardinal principle of the law of negligence that, in the absence of a statute, the test of liability is the exercise of reasonable care. That means the care which a reasonable and prudent person would and should exercise under the same or similar circumstances. See *Karavas v. Poulos,* 381 Pa. 358, 364, 113 A. 2d 300; *Camp v. Allegheny County,* 263 Pa. 276, 282, 106 A. 314; *Tua v. Brentwood Motor Coach Company,* 371 Pa. 570, 575, 92 A. 2d 209.

While drug companies should certainly be required to exercise care "commensurate with the harm which would be likely to result" if such care were not exercised, *Henderson v. Nat. Drug Co.,* 343 Pa. 601, 610, 23 A. 2d 743, they are not insurers, and should not be, as the Majority seem to require, responsible for any and every injury which results from the use of their products. To hold this Company liable would require

a very farfetched and unjustifiable extension of the prior decisions of this Court and would in reality make them insurers. I believe that, as a matter of law, this defendant's conduct and warning were undoubtedly reasonable and adequate under the facts and circumstances presented by this record, and, accordingly, I would enter judgment n.o.v. in its favor.

---

### Concurring Opinion by Mr. Justice Roberts:

I concur fully in the result reached by the majority and wish only to make explicit my view that a physician is not insulated from malpractice liability merely by possessing and employing the skill and knowledge usually possessed by physicians in the "same or similar locality." It is also my view that a medical expert is not incompetent to testify as a witness in a malpractice action simply because he does not reside or practice in or otherwise profess a familiarity with the practice of medicine in the same or similar locality.

During the period of its original formulation in the middle and late nineteenth century, the "locality rule" was plausibly expedient. The law was arguably wise in indulging in the assumption that medical knowledge, skill and care varied considerably from community to community. Thus in the leading case of *Small v. Howard*, 128 Mass. 131 (1880), the Massachusetts Supreme Court sought to protect the rural and small town practitioner by holding that such a practitioner "was not bound to possess that high degree of art and skill possessed by eminent surgeons practicing in large cities." Id. at 132.

Present day conditions, however, cast much doubt upon the rule. Modern systems of transportation and communication, the proliferation and widespread dissemination of medical literature, and the prevalence and availability of seminars and postgraduate courses make it both possible and desirable for *all* practition-

ers to be reasonably familiar with current medical advances. Furthermore, the major source of a physician's professional expertise is not the particular locality in which he practices but initially the institutions in which he received his education and professional training.

In light of the foregoing, the locality rule is an anachronism. Massachusetts, one of the original locality rule jurisdictions, has recognized this and abandoned the rule. See *Brune v. Belinkoff*, 354 Mass. 102, 235 N.E. 2d 793 (1968), overruling *Small v. Howard*, supra. We should do likewise. The standard of care required of a specialist or general practitioner should be that of a reasonable specialist or general practitioner in similar circumstances practicing medicine in light of present day scientific knowledge. For the same reasons, a medical expert should be deemed a competent witness even if he does not reside or practice in the same or similar locality or is not otherwise familiar with the practice of medicine in the same or similar locality.