## Romanishan v. International Harvester Company

*Norman Seidel* and *Herbert Toff,* for plaintiff.

*Kolb, Holland, Antonelli & Heffner* and *James F. Pritchard,* for defendants.

WILLIAMS, JR., J., February 6, 1973.—In this product liability case, the jury rendered a verdict for defendants and plaintiff has filed motions for judgment n.o.v. and for a new trial. Plaintiff instituted the action to recover for personal injuries he suffered while using a forage harvester machine manufactured by International Harvester Company and sold by Vough & Sons. Suit was begun in assumpsit and trespass, and prior to trial plaintiff elected to proceed solely on the strict liability theory of section 402A of the Restatement of Torts, 2d, adopted in Pennsylvania in Webb v. Zern, 422 Pa.. 424. Defendants' responsibility was predicated on defective design of the machine rather than a malfunction.[1]

---

[1] For this reason and by stipulation of the parties, defendants' potential liability was entirely a joint one.

### JUDGMENT N.O.V.

In reviewing the testimony, the governing principle is that the verdict winner is entitled to the benefit of all findings that reasonably could have been made in his favor and that all contrary evidence is to be rejected: Jemison v. Pfeifer, 397 Pa. 81.

In general terms, a forage harvester is an agricultural machine which cuts off corn stalks in the field, passes the stalks through rollers into a cylinder with rotating knives where the stalks are cut into small pieces and ejects the pieces, now silage or forage, through a spout or chute into a following wagon. The harvester derives its power through a drive shaft from the engine or power take-off of the tractor which pulls it.

The machine in question was viewed by the jury prior to the opening statement of plaintiff and was again viewed in static operation prior to the closing arguments of counsel.

The harvester manufactured by International was sold by Vough, its dealer, to Mark Deysher, Sr.,[2] in August, 1966. On September 18, 1967 Deysher loaned the machine to plaintiff and with other members of his family assisted plaintiff in cutting his corn.

Nicholas Romanishan, plaintiff, was a machinist by trade but had lived on a farm and engaged in part-time farming since his youth. At the time of the accident on September 18, 1967, he owned or leased a total of 97 acres, all of which was planted in corn for his cattle. He owned an Allis-Chalmers forage harvester of the same general design as that manufactured by defendant. On September 17th he discovered that his

---

[2] Deysher was joined as an additional defendant but, by stipulation of the parties, the complaint was withdrawn prior to trial.

machine was broken and asked to borrow Deysher's harvester.

Deysher testified that he told plaintiff that in operating the International harvester it was necessary to keep the tractor engine at full power to avoid a choke-up or blockage of the silage in the chute. He gave plaintiff no other instructions concerning operation of the harvester or clearing a choke-up should it occur.

Although plaintiff had never before used an International harvester, he had observed them at farm shows and working in the field. He used the International all afternoon without difficulty and after dinner took his wife with him on the tractor to show her the operation of the machine. After cutting the first row of corn, he noticed that no silage was coming out of the chute. Plaintiff stopped the tractor and reversed the gathering chains to be certain the choke-up was not at the intake, and then disengaged the power take-off from the tractor to the harvester. When he did so, he heard a clicking noise, characteristic of forage harvesters, indicating that the rotor containing the cutting knives was still spinning.

Plaintiff waited until the clicking noise stopped, which indicated to him that the cutting cylinder had stopped rotating.[3] Then, from the tongue of the following wagon he reached down into the top of the chute to clear the silage which blocked it. Mark Deysher, Jr., had arrived at the scene and plaintiff asked him about removing the rest of the silage. Deysher

---

[3] While plaintiff testified that the clicking noise indicating the rotation of the blades had stopped some time prior to when he put his hand down into the cutting cylinder, the jury during the view may well have observed, as did the trial judge, that the axle upon which the knives were mounted continued to spin slowly after the clicking noise ceased.

told him "from the bottom" and that "the knives were in there." Deysher indicated a door on the lower part of the chute approximately six inches above the cutting cylinder. Above the door was a sign or decal reading: "Be Careful. Do not open until cutting mechanism stops."

When he opened the door or clean-out hole in the chute, he used a wrench to clear the silage in front of it and reached up into the chute to clear the balance of the choke-up. Plaintiff testified that he then reached down into the cutting mechanism, felt a hard surface and brought out a handful of silage. He reached down a second time; as he was bringing his hand up, he felt a pain, pulled his hand out and when he did so most of the hand was amputated. Plaintiff stated that the cutting knives on his own harvester required some effort to set them moving and that he believed it was safe to put his hand down into the cutting mechanism after the clicking noise stopped.

Plaintiff's expert, Professor H. Maurice Carlson, a professor of mechanical engineering at Lafayette College, testified that in his opinion the injury occurred when plaintiff, reaching into the cutting cylinder the second time, grabbed one of the knives and in quickly extracting his hand set the rotating knives in motion.

While Prof. Carlson had had some early experience in the industry, he was not expert in the field of agricultural machinery. He examined the harvester in question three weeks prior to trial in a shed on the Deysher farm and determined that a force of two ounces applied to one of the knife blades of the cylinder was sufficient to move it. In Professor Carlson's opinion the design of the machine was defective because the cutting mechanism could be easily set in motion and/or the warning on the clean-out door above the cylinder was inadequate to advise the farmer

against the danger of reaching down into the cutting cylinder. He further described two devices designed by him to lock the cutting mechanism when silage was removed from the cylinder below the clean-out hole.

Defendants' experts were design engineers for International Harvester and one of its competitors and stated their experience with the machine and its use by farmers in the field. Their testimony questioned the practicality and effectiveness of both of the safety devices suggested by plaintiff's expert and indicated that the machines of all six companies producing a "throwing" type of harvester were of similar design and that none of them employed a device to prevent the cutting cylinder from rotating after the power take-off was disengaged. The machines do have a rachet or pawl which makes the clicking noise referred to previously and prevents the cylinder from moving in reverse.

Their testimony and that of defendant, Vough, who testified to an extensive background in agricultural equipment and farming methods, indicated that while choke-ups are expected by both manufacturer and farmer, the choke-up occurs due to insufficient power from the tractor and builds from the top of the chute down the spout; that when the spout is full, the rotating cylinder spews the cut cornstalks out of the front of the machine, and that the blockage does not jam the cylinder. As a result, farmers know that it is not necessary to reach down into the cylinder and clean it out but merely necessary to clean the spout and that engaging the power will throw out any silage which drops into the cutting cylinder. Defendants' witnesses further testified that the small door on the chute is to facilitate cleaning the lower part of it; that there is no reason to reach down into the cutting cylinder and that the purpose of the decal above the

door is to warn the user not to open it while the cylinder is rotating to avoid having material thrown out upon him rather than up the chute.

Defendants also introduced the history of the accident given by plaintiff to his physician to the effect that the accident happened when he reached down into the revolving blades of the corn chopper.

The rule of strict liability for defective products is set forth in section 402A of the Restatement 2d, Torts, as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

There is no dispute that plaintiff was within the protected class of users of the machine and that there had been no substantial changes in the harvester between the date it was sold to Deysher and the date of the accident.

Plaintiff contends now as he did at trial that defendants' harvester was of defective design because the rotor in the cutting cylinder had no safety device to prevent a farmer from inadvertently setting it in

motion and it could be set in motion with little force; that this defect in design was unreasonably dangerous to plaintiff because of the proximity of the clean-out hole to the cutting cylinder and that the warning above the clean-out hole was inadequate to warn plaintiff of the danger of reaching down into the cutting cylinder.

Defendants' argument has been that the harvester was not unreasonably dangerous because, even if dangerous, it was safe for its normal and intended use as an agricultural machine; that farmers know of the danger of the knives in the cutting cylinder and do not put their hands down into the knives in using the machine and that it is not necessary to do so to clear a choke-up; further, that this danger is obvious and that the sign above the clean-out hole was to warn the user against having silage blown out into his face. Finally, defendants contend that, under the circumstances, plaintiff assumed the risk of injury by putting his hand down into the cutting cylinder.

Special findings were not requested and the foregoing summary indicates the various possibilities upon which the jury's verdict might have been based.

Plaintiff argues that the adverse verdict was induced by the trial court's charge and points out that on 11 occasions the charge referred to "normal use vs. misuse" or "intentional misuse" of the harvester. The rules of law concerning product liability are relatively new, involving considerably different concepts to be explained to a jury than in an ordinary negligence case. At the outset of the charge, the trial judge stated all of the applicable rules of law, summarized the testimony and the theories of both sides and restated the legal principles in relation to the case. At the specific request of the jury after they had been deliberating for some time, the legal principles applicable to strict

liability were again explained. While the trial court may be faulted for verbosity or repetition, a reading of the entire charge does not support plaintiff's argument that prominence or undue attention was given to abnormal use.

"It is basic to a fair trial that the issues be clearly defined for a jury's intelligent understanding and that in determining if prejudicial eror is present, the entire charge must be considered and its general effect noted: [citing cases]. In fact, one of the primary duties of a trial judge is to so clarify the issues that the jury may understand the questions to be resolved: [citing cases]. A trial judge may properly define all pertinent questions of law, but if he fails to clarify the issues and the application of the law to the facts, a fair trial is not present": Smith v. Clark, 411 Pa. 142, 147. In the present case, the challenged terms were used in the proper context of the various rules defining the liability issues and did not mislead the jury or give them a false impression as to the issues before them.

Plaintiff next argues that he is entitled to judgment n.o.v. because there was testimony on defendants' side of the case that the clean-out door is to be used to clear a choke-up and it could be anticipated that farmers would put their hands in the hole, thus establishing that the design was dangerous as a matter of law. However, the determination of whether the machine was *unreasonably* dangerous[4] and the decal inadequate depended not merely upon placing one's hand in the clean-out hole but also upon whether, in normal use, farmers reach down into the cutting

---

[4] Plaintiff admitted he knew the machine to be dangerous by the basic nature of its operation with the gathering chains, sickle bar, rollers, knives, etc.

mechanism to clear a choke-up and are aware of the danger of the knife blades. This factual issue was properly left to the jury to resolve. The trial court instructed them in accordance with comment (i) of section 402A that "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." The court further charged that in this case it was the ordinary knowledge common to the farming or agricultural community which established the standard to determine whether or not the harvester was unreasonably dangerous. While plaintiff attacks this portion of the charge and objected during trial to testimony related to it, the court's ruling and charge reflect the obvious intendment of the language of comment (i), i.e., that "the ordinary consumer who purchases it [a forage harvester]" is a farmer who possesses "the ordinary knowledge common to the [farming] community as to its characteristics."

We cannot agree with plaintiff's contention that under section 402A the "user" or "consumer" of a product means *any* user of it. Such an interpretation would surely make the seller of any specialized product an insurer of the user's safety. Although there appear to be no court decisions directly on point, there is authority for the trial court's position. Thus, in Incollingo v. Ewing, 444 Pa. 263, 288, a product liability case involving a prescription drug, the court stated that the sufficiency of warnings about the drug's use is determined not in terms of the general public or the patient but to the doctor who uses it. Bartkewich v. Billinger, 432 Pa. 351, involved a glass breaking machine and, in dismissing plaintiff's contention that he had not been properly instructed as to how to operate the machine, the court said: "And we hardly be-

lieve it is any more necessary to tell an *experienced factory worker* that he should not put his hand into a machine."

In Berkebile v. Brantly Helicopter Corp., 219 Pa. Superior Ct. 479, the issue was whether "the helicopter did not allow the *average pilot* sufficient time to go into autorotation . . ." The caveat to section 402A and comment (o) indicate that the rule of strict liability has not been extended to casual bystanders.[5] In our opinion, the charge in the present case properly reflected the meaning of comment (i).

Plaintiff next argues that the jury should have found the machine unreasonably dangerous because the sign above the clean-out door: "Be Careful. Do not open until cutting mechanism stops," implied that it was safe to open the door and put his hand inside after the cutting mechanism had stopped. Defendants argue that even if there is such an implied invitation to use the clean-out hole, an implication which must be accepted because of its very name, the danger from putting one's hand down into the cutting cylinder was obvious, well known in the farming community, and a specific warning was not required.

With respect to this issue, the jury was charged in accordance with comment (j) of section 402A:

"Now, in order to prevent the machine from being unreasonably dangerous, if such you find it to be, it may be necessary for the seller to give directions or warnings as to its use. Such directions or warnings given by the seller must be suitable and adequate to

---

[5] In Eyer v. Bethlehem Millwork, Inc., 40 Northamp. 228, 232, this court, per Palmer, P. J., held that nonusers may recover under section 402A "where the likelihood of injury to such plaintiffs arising from the use of the product and from the particular risk which makes it 'unreasonably dangerous' is reasonably forseeable."

alert and bring home to the user of the product the nature and the extent of the danger involved in using the product. However, a seller is not required to warn with respect to a machine which is only dangerous or potentially so when misused and the danger or potentiality of the danger from such misuse is generally known and recognized. Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning which is safe for use if it is followed is not in a defective condition nor is it unreasonably dangerous. If the seller could reasonably foresee that a user, through inadvertence, could subject himself to, in this case, the risk or the danger that the cutting cylinder could be easily set in motion by virtue of its close proximity to the cleanout hole, then the seller would be liable unless he, first, installed an appropriate safety device or, secondly, provided suitable and adequate warnings commensurate with the danger. However, the seller is not liable for the injuries resulting from the intentional misuse of the machine. 'Intentional misuse,' in this context, means, first, that the use was for a purpose other than that for which the product was designed or intended and, therefore, it was not foreseeable by the manufacturer; or, two, that the act was one which an ordinary user of the machine, with the ordinary common knowledge of the community as to the characteristics of the machine, would not intentionally commit."

While this instruction appears to be a proper statement of the law, plaintiff contends that it misled the jury because it was uncontradicted that the harvester had no safety device to lock the cutting cylinder and there was no warning as to the danger of setting the knives in motion after the cutting mechanism stopped. Plaintiff's argument, however, overlooks that portion

of the rule in comment (j) that "the seller is not required to warn . . . when the danger, or potentiality of danger, is generally known and recognized." The issue of the adequacy of the warning was a fact question for the jury. Crane v. Sears Roebuck & Co., Inc., 218 Cal. App. 2d 855, 32 Cal. 754, involved the adequacy of a warning on a surface preparation product for painting. The warning indicated that the contents were inflammable and gave off poisonous fumes but said nothing about the combustibility of the fluid or the fumes. The California appellate court ruled that whether the label gave appropriate warning was for the jury. In Incollingo, supra, at page 288, our Supreme Court held that "whether or not the warnings on the cartons, labels and literature of Parke, Davis in use in the relevant years were adequate, and whether or not the printed words of warning were in effect cancelled out and rendered meaningless in the light of the sales effort made by the detail men, were questions properly for the jury."

Plaintiff's final argument that the trial judge erred by summarizing defendant's contention in the charge, as he is required to do,[6] requires no comment except to point out that plaintiff's assertion that the trial court "evidently approved" defendants' theory is without foundation or support in the record.

The principal issues as to whether the design of the harvester was defective because it was "unreasonably dangerous" and whether the warning was inadequate

---

[6] Kimmel v. Yellow Cab Co., 414 Pa. 559, 563: "The duty of a trial judge in charging a jury is twofold: (1) he must make an accurate statement in plain language of the applicable principles of law, and (2) he must accurately, impartially, without prejudice to any litigant and without usurping the jury's function, assist the jury in applying these principles to the facts of the case before them."

were contested factual issues to be resolved by the jury. In fact, had the harvester been operating it appears that the court would have been required to enter a compulsory nonsuit or to direct a verdict for defendants. In Wright v. Massey-Harris, Inc., 68 Ill. App. 2d 70, 215 N.E.2d 465, a farmer was injured when he reached into an operating cornshucker to remove jammed ears of corn. The Illinois court held that the question of whether the lack of a safety screen which would have prevented the farmer from reaching into the machine constituted a "defective condition unreasonably dangerous to the user" was for the jury. This rationale was specifically rejected by our Supreme Court in Bartkewich v. Billinger, supra, an operating glass factory machine case, where the court entered judgment n.o.v. for the manufacturer, holding as a matter of law that plaintiff encountered a known risk in placing his hand in the machine. The court indicated that had plaintiff in these cases suffered injury through an accidental contact with the machine which was not prevented by a safety device, "he likely would have a valid §402A claim": Id. page 355. It was on this theory that the court permitted the case to go to the jury. Plaintiff's unfortunate accident does not entitle him to judgment notwithstanding the verdict.

## NEW TRIAL

In support of this motion[7] plaintiff argues that the trial court erred in charging the jury on contributory negligence and voluntary assumption of risk and in failing to charge that the design of other manufac-

---

[7] Several of plaintiff's arguments in support of his motion for judgment n.o.v. attack rulings and the charge of the trial court and would more properly form the basis of a new trial motion. Our discussion of those reasons, therefore, is equally applicable to the present motion.

turers did not establish a standard of safe design. In addition, he seeks a new trial on the basis of after-discovered evidence.

As to contributory negligence, plaintiff concedes that the trial court properly defined contributory negligence and instructed the jury that plaintiff's failure to discover a defect in the machine or guard against the possibility of its existence would not prevent recovery if the machine sold by defendants was in a defective condition unreasonably dangerous to the user. Plaintiff attempts to buttress his contention by arguing that in defining "unreasonably dangerous" under section 402A to mean not safe for normal use and by the standard of ordinary knowledge of the farming community, the court, in effect, made contributory negligence a defense. We disagree.

As we have previously pointed out, strict liability requires proof that the product is unreasonably dangerous to the ordinary consumer who uses or purchases that product. This provides an objective test and is not determined by the particular plaintiff's subjective appreciation of danger: Hardy v. Hull Corp., 446 F.2d 34 (9th Cir., 1971). Elimination of "the normal use by farmers" test as suggested by plaintiff would make every manufacturer an insurer of the user's safety, a result not intended under section 402A: Bartkewich, supra.

Reading the charge in context as to the definitions of "unreasonably dangerous" and "contributory negligence" demonstrates that the charge was proper and not misleading. In defining contributory negligence and assumption of risk, for example, the court omitted the language in comment (n) which refers to the latter as "a form of contributory negligence" specifically to avoid misleading the jury. In addition, when given the opportunity before the jury began its deliberations,

plaintiff failed to mention any such ambiguity or misleading statements.

Plaintiff's primary contention is that, while the court's charge as to the law of assumption of risk was correct under comment (n) of section 402A and sections 496A, C and D, there was no evidence to justify submission of that issue to the jury.

Bearing in mind that the alleged defective condition was the proximity of the cutting mechanism to the clean-out hole, the ease with which the knives could be set in motion and the failure to provide an adequate warning of the danger of reaching down into the cutting mechanism through the clean-out hole, the test of plaintiff's assumption of the risk submitted to the jury was the subjective standard of whether this plaintiff voluntarily and unreasonably proceeded to enter a known danger.[8]

---

[8] The court charged on this issue as follows:

"However, under this rule of strict liability, the plaintiff cannot recover against a seller of a product in a defective condition that is unreasonably dangerous if the plaintiff is guilty of what is known in the law as assumption of the risk. If the user of a product knows of the defect in it and voluntarily and unreasonably proceeds to use the product or to encounter a known danger, he cannot recover against the seller. This is what we refer to as the doctrine of assumption of risk. The burden to establish this is upon the defendant, not upon the plaintiff.

"This rule of assumption of risk is what we call in the law an affirmative defense, and the defendants have the burden of establishing that the plaintiff was guilty of assumption of risk by the same standard of proof as the plaintiff, and that is by a preponderance of the evidence.

"The rule, again, is that if the user of a product knows of the defect and voluntarily and unreasonably proceeds to use the product or to encounter a known danger, he cannot recover. In this context, 'voluntarily' means an act done by design or intention; that is, intentional, proposed, intended, or not accidental.

"In defining this rule, the law makes it clear that what is envisioned is a conscious appreciation of the danger and a willing-

In our view defendants were entitled to have the jury pass upon this issue in view of testimony that plaintiff had been involved in farming for many years and was familiar with various farm machines. He had used forage harvesters for at least two or three years prior to the accident and owned an Allis-Chalmers forage harvester similar in design to that of International Harvester with a free spinning cutting mechanism; he knew the knives were just below the cleanout hole and that if the blades were rotating freely when a choke-up occurred there would be an insignificant amount of silage in the cylinder. The only differences between the two machines apparent in the testimony were that his own harvester had nine blades

---

ress to risk it. A subjective standard is applied to assumption of the risk in determining whether the plaintiff knows, understands and appreciates the risk. It is said that assumption of the risk is a matter of what the plaintiff knows, understands and is willing to accept.

"I have said the standard to be applied is a subjective one, and by that I mean it is what this particular plaintiff, in fact, knows, understands and appreciates. If, by reason of age or lack of information, experience, intelligence or judgment, the plaintiff does not understand the risk involved in a known situation, he will not be taken to have assumed the risk.

"If you find that the plaintiff voluntarily and unreasonably placed his hand into the rotor and knives when he knew where they were located and knew that the rotor knives were easily set in motion and was aware of the danger of being cut by them, then you would find that the plaintiff had assumed the risk and would return a verdict for the defendant. On the other hand, the plaintiff could not be found to have assumed the risk if you find that he did not know, understand or appreciate the risk that the rotor knives could easily be set in motion or if you find that he inadvertently placed his hand into the rotor and knives or if you find that he did not unreasonably place his hand into the rotor and knives. If for any of these reasons you conclude that the plaintiff did not assume the risk, you would then proceed to consider the question of damages."

in the cutting rotor rather than six and that the cutting rotor of his machine required more force to set it in motion. He knew that there was no device to keep the blades from rotating in a forward direction. When all of these circumstances are viewed in their cumulative significance, it would have been error not to permit the jury to determine whether plaintiff was "aware of the danger, and nevertheless proceed[ed] unreasonably to make use of the product": Comment (n), §402A; Ferraro v. Ford Motor Co., 423 Pa. 324, 327; Bartkewich, supra; Elder v. Crawley Book Machinery Co., 441 F.2d 771 (3rd Cir.).

We turn next to plaintiff's contention that he is entitled to a new trial because the trial court failed to instruct the jury that what other manufacturers of forage harvesters do, did not establish a standard as to a safe or defective design.

Over plaintiff's objection, the court allowed cross-examination of plaintiff and his expert as to their knowledge of other harvesting machines and permitted defendants' expert to testify that none of the competing harvesters of the same type employed a safety device such as that suggested by Professor Carlson. Defendants' expert admitted on cross-examination that good design practice requires a product which does not have a defective safety design, even though all other manufacturers do the same thing.

Plaintiff's requested charge on this issue was as follows:

"17. It doesn't matter what other manufacturers provide, if the safety design was inadequate or improper so as to be unreasonably dangerous either because it failed to have a safety lock or because the warning was inadequate, it was defective even if all the other manufacturers made them the same way, and

Mr. Romanishan were the only person injured by this defect."

This point was properly refused by the court as an incomplete statement of legal principle. At the completion of the charge, plaintiff's counsel requested an additional instruction to the effect that what other manufacturers do "did not establish any particular standard as to what was a safe and what was an unsafe design." This request was refused.

Plaintiff relies upon the decision in Welsh v. Kleiderer, 440 Pa. 47, a negligence case, to establish a rule here that evidence as to the harvesters of other companies was inadmissible. In that case, however, the Supreme Court granted a new trial because the lower court had affirmatively instructed the jury that the custom or practice of the industry conclusively established the standard of care by which to judge negligence. The opinion does not indicate that such evidence is inadmissible. Recently, in Berkebile v. Brantly Helicopter Corp., 219 Pa. Superior Ct. 479, supra, a product liability case decided after the present trial, the Superior Court held that compliance with Federal Aviation Agency standards as to helicopters was admissible to show that the product was not unreasonably dangerous but not conclusive as to the existence of a design defect. The issue was for the jury. Also see Forry v. Gulf Oil Corp., 428 Pa. 334, 342.

In design defect cases, the basic rule of section 402A is simply stated, but the trial of such cases involves numerous complex legal issues and it is difficult to avoid isolating and juxtaposing the various issues and testimony to highlight one aspect over the others. "Alleged errors with regard to jury instructions . . . must be considered in relation to the entire charge, particularly other portions of the charge dealing with cognate matters, and in the light of the evidence":

Brennan v. St. Luke's Hospital, 446 Pa. 339, 344. In carefully reviewing the testimony in this case, it is clear that evidence as to the design of other forage harvesters was relevant and admissible on the issues of whether the defendants' harvester was unreasonably dangerous to farmers and the knowledge of the farming community as to the operation of forage harvesters,[9] and whether defendants' machine was appreciably less safe than other harvesters.[10]

While we agree with plaintiff that in product liability cases, the custom or practice of the industry does not conclusively establish the standard of safe design and that it was error for the trial court not to charge as orally requested by him, we do not believe the omission constituted such basic, fundamental and prejudicial error so as to require a new trial: Segriff v. Johnston, 402 Pa. 109, 113.

The jury was not told that what other manufacturers did established the standard of safe design, but, on the contrary, they were instructed in accordance with section 402A and comment (a) that if the product was unreasonably dangerous the rule of strict liability applied "even though the defendant exercised all possible care in the preparation and sale of the product." Thus, the error which required the grant of a new trial in Welsh and Brantly was not present here and the omission was not "substantially erroneous" or misleading: Mount v. Bulifant, 438 Pa. 265, 270.

Finally, plaintiff urges that he be granted a new trial on the basis of after-discovered evidence. At trial, defendants' witnesses testified that when a choke-up occurs in the spout of the harvester, it is only necessary

---

[9] Restatement 402A, comment (i).

[10] Dyson v. General Motors Corp., 298 F. Supp. 1064 (E. D. Pa.).

to clean out the spout and that whatever silage falls down into the cutting cylinder will be blown out when the power is engaged, rendering it unnecessary for a farmer to reach down into the cutting mechanism to clean it out. Plaintiff offered no countervailing testimony in his case in chief or in rebuttal. He now asserts that during the cutting season in the fall of 1971, following the trial, it was "discovered" that the above procedure caused a secondary blockage when the silage was blown up into the spout and that the stop and start procedure had to be repeated three times before the accumulated silage was blown clear.

The requirements for a new trial on the basis of after-discovered evidence were set forth in Hagopian v. Eskandarian, 396 Pa. 401, 407-08, as follows: "[It] must have been discovered after the trial, be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result."

Plaintiff argues that this evidence, which clearly would have been relevant, might have changed the verdict. However, his explanation that he could not anticipate the nature of the defense theory lacks persuasiveness. Three years elapsed between the date of the accident and trial and the entire case centered around the cutting cylinder, the clean-out hole and its use to remove jammed-up silage. The harvester was available to plaintiff and inspected by his experts. The trial of the case continued over five days and contradictory evidence as to the knowledge of the farming community and the manner in which farmers clear a choke-up would have been proper rebuttal evidence. No such offer was made. In short, the evidence was equally available prior to trial and cannot be construed to be post trial "discovery."

## ORDER OF THE COURT EN BANC

And now, February 6, 1973, plaintiff's motions for judgment n.o.v. and for a new trial are denied; judgment upon the verdict is entered for defendants.